

# The University of the State of New York

## The State Education Department
### State Review Officer
www.sro.nysed.gov

No. 19-012

**Application of the BOARD OF EDUCATION OF THE KATONAH-LEWISBORO UNION FREE SCHOOL DISTRICT for review of a determination of a hearing officer relating to the provision of educational services to a student with a disability**

**Appearances:**

Thomas, Drohan, Waxman, Petigrow & Mayle, LLP, attorneys for petitioner, by James P. Drohan, Esq.

Law Office of Peter D. Hoffman, PC, attorneys for respondents, by Peter D. Hoffman, Esq.

## DECISION

### I. Introduction

This proceeding arises under the Individuals with Disabilities Education Act (IDEA) (20 U.S.C. §§ 1400-1482) and Article 89 of the New York State Education Law.  Petitioner (the district) appeals from the decision of an impartial hearing officer (IHO) following remand, which found that it failed to offer an appropriate educational program to respondents' (the parents') daughter and ordered it to reimburse the parents for their daughter's tuition costs at the Grove School (Grove) for a portion of the 2014-15 and 2015-16 school years.  The appeal must be sustained.

### II. Overview—Administrative Procedures

When a student in New York is eligible for special education services, the IDEA calls for the creation of an individualized education program (IEP), which is delegated to a local Committee on Special Education (CSE) that includes, but is not limited to, parents, teachers, a school psychologist, and a district representative (Educ. Law § 4402; see 20 U.S.C. § 1414[d][1][A]-[B]; 34 CFR 300.320, 300.321; 8 NYCRR 200.3, 200.4[d][2]).  If disputes occur between parents and school districts, incorporated among the procedural protections is the opportunity to engage in

mediation, present State complaints, and initiate an impartial due process hearing (20 U.S.C. §§ 1221e-3, 1415[e]-[f]; Educ. Law § 4404[1]; 34 CFR 300.151-300.152, 300.506, 300.511; 8 NYCRR 200.5[h]-[*l*]).

New York State has implemented a two-tiered system of administrative review to address disputed matters between parents and school districts regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability, or a student suspected of having a disability, or the provision of a free appropriate public education to such student" (8 NYCRR 200.5[i][1]; see 20 U.S.C. § 1415[b][6]-[7]; 34 CFR 300.503[a][1]-[2], 300.507[a][1]). First, after an opportunity to engage in a resolution process, the parties appear at an impartial hearing conducted at the local level before an IHO (Educ. Law § 4404[1][a]; 8 NYCRR 200.5[j]). An IHO typically conducts a trial-type hearing regarding the matters in dispute in which the parties have the right to be accompanied and advised by counsel and certain other individuals with special knowledge or training; present evidence and confront, cross-examine, and compel the attendance of witnesses; prohibit the introduction of any evidence at the hearing that has not been disclosed five business days before the hearing; and obtain a verbatim record of the proceeding (20 U.S.C. § 1415[f][2][A], [h][1]-[3]; 34 CFR 300.512[a][1]-[4]; 8 NYCRR 200.5[j][3][v], [vii], [xii]). The IHO must render and transmit a final written decision in the matter to the parties not later than 45 days after the expiration period or adjusted period for the resolution process (34 CFR 300.510[b][2], [c], 300.515[a]; 8 NYCRR 200.5[j][5]). A party may seek a specific extension of time of the 45-day timeline, which the IHO may grant in accordance with State and federal regulations (34 CFR 300.515[c]; 8 NYCRR 200.5[j][5]). The decision of the IHO is binding upon both parties unless appealed (Educ. Law § 4404[1]).

A party aggrieved by the decision of an IHO may subsequently appeal to a State Review Officer (SRO) (Educ. Law § 4404[2]; see 20 U.S.C. § 1415[g][1]; 34 CFR 300.514[b][1]; 8 NYCRR 200.5[k]). The appealing party or parties must identify the findings, conclusions, and orders of the IHO with which they disagree and indicate the relief that they would like the SRO to grant (8 NYCRR 279.4). The opposing party is entitled to respond to an appeal or cross-appeal in an answer (8 NYCRR 279.5). The SRO conducts an impartial review of the IHO's findings, conclusions, and decision and is required to examine the entire hearing record; ensure that the procedures at the hearing were consistent with the requirements of due process; seek additional evidence if necessary; and render an independent decision based upon the hearing record (34 CFR 300.514[b][2]; 8 NYCRR 279.12[a]). The SRO must ensure that a final decision is reached in the review and that a copy of the decision is mailed to each of the parties not later than 30 days after the receipt of a request for a review, except that a party may seek a specific extension of time of the 30-day timeline, which the SRO may grant in accordance with State and federal regulations (34 CFR 300.515[b], [c]; 8 NYCRR 200.5[k][2]).

**III. Facts and Procedural History**

This appeal arises from an IHO's decision issued after remand (see Application of the Bd. of Educ., Appeal No. 17-065). Additionally, the student has been the subject of a prior State-level administrative appeal (Application of a Student with a Disability, Appeal No. 13-162). Accordingly, the parties' familiarity with the facts and procedural history through the prior administrative appeal is presumed and will not be repeated in detail.

In July 2012, the CSE determined that the student was eligible for special education as a student with an emotional disturbance, and, in September 2012, the parents unilaterally placed the student at Grove (Parent Ex. E at p. 1; Dist. Exs. 1 at p. 4; 3 at p. 1; 20 at p. 1).[1, 2]  The student attended Grove during the 2012-13 and 2013-14 school years (Parent Exs. NN at p. 2; OO; Dist. Ex. 12 at p. 2).

A CSE convened on June 13, 2014 for the student's annual review to develop an individualized education program (IEP) for the 2014-15 school year (twelfth grade) (Dist. Ex. 4). The CSE recommended a 12-month school year program in an 8:1+1 special class placement in a Board of Cooperative Educational Services (BOCES) therapeutic support program (TSP) with before and after school intervention services (BASIS) (id. at pp. 1-3, 10).[3]  The CSE also recommended that the student receive one 30-minute session per week of individual counseling services and one 30-minute session per week of counseling in a group (id. at p. 10).  The CSE further recommended a weekly psychiatric consultation for the district staff and the student's family (id.).  The CSE reviewed a letter from the parents that described the reasons why they believed the recommended program and placement were inappropriate for the student and expressed their opinion that Grove remained the appropriate school for their daughter (Dist. Exs. 4 at p. 2; 21).

In June and July 2014, over a five-day period, a private psychologist conducted a psychological evaluation of the student at district expense (Dist. Ex. 12 at pp. 1-38).  The psychological evaluation report dated September 30, 2014 (September 2014 psychological evaluation report) reflected assessments of the student's intellectual functioning, academic achievement, and social/emotional/behavioral functioning (id.).  The evaluating psychologist's diagnostic impressions of the student included bipolar disorder, borderline personality disorder, attention deficit disorder (ADD), reading disorder, and disorder of written expression, and she recommended that the student attend a "therapeutic residential" placement (id. at pp. 27-28). According to the district's director of special services (director) the district received a copy of the September 2014 psychological evaluation report on October 21, 2014 (Tr. pp. 93, 127-28; see also Dist. Ex. 12 at p. 1).

The student attended Grove for the duration of the 2014-15 school year (see Parent Exs. HH; II; NN; OO).

The CSE convened on May 13, 2015 for the student's annual review to develop an IEP for the 2015-16 school year (Dist. Ex. 5).  The CSE discussed the student's progress at Grove during the 2014-15 school year, as well as the student's plan to attend Grove until August 16, 2015 and

---

[1] The student's eligibility for special education and related services as a student with an emotional disturbance is not in dispute (see 34 CFR 300.8[c][4]; 8 NYCRR 200.1[zz][4]).

[2] Grove has not been approved by the Commissioner of Education as a school with which school districts may contract for the instruction of students with disabilities (see 8 NYCRR 200.1[d], 200.7).  Grove is an out-of-State co-educational therapeutic boarding school (see Tr. pp. 1158, 1321).

[3] According to the June 2014 IEP, the BASIS component of the student's program was recommended to occur daily throughout the school year at her home (Dist. Ex. 4 at p. 10).

then begin orientation at a college to which she had been accepted to attend (id. at pp. 1-2).  In addition, the CSE discussed that the student "remain[ed] eligible for programming until she either attain[ed] a NYS Local or Regents Diploma, or it's [sic] equivalent" or until age 21 (id. at p. 2).  The CSE indicated it would seek guidance as to whether a diploma from Grove would be equivalent to a State local diploma (id.).[4]  The CSE recommended a 12-month program in an 8:1+1 special class placement in a BOCES TSP with BASIS (id. at pp. 2, 9).  The CSE continued to recommend one 30-minute weekly session of counseling in a group and one 30-minute weekly session of individual counseling, and a weekly psychiatric consultation for the district staff and the student's family (compare Dist. Ex. 4 at p. 10, with Dist. Ex. 5 at p. 9).  The May 2015 CSE meeting information summary attached to the IEP indicated the district would provide referral packets to prospective programs and then the CSE would reconvene to consider the programs that responded (Dist. Ex. 5 at p. 2).

In a letter dated June 5, 2015, a BOCES staff member notified the district that the BOCES TSP program had accepted the student (Dist. Ex. 14).  On June 11, 2015, the CSE reconvened and continued to recommend the same program as set forth in the May 2015 IEP (compare Dist. Ex. 5, with Dist. Ex. 6).  The CSE indicated that the BOCES TSP could prepare the student to take Regents examinations in August (Dist. Ex. 6 at p. 2).  The parents indicated that they did not intend for the student to take Regents examinations since the student had already been accepted into college (id.).  The parents rejected the IEP and the student remained at Grove, graduating in August 2015 (Parent Exs. NN at p. 1; PP; FFF at p. 1; Dist. Ex. 6 at p. 2).[5]

### A. Due Process Complaint Notice

By amended due process complaint notice dated July 30, 2015, the parents alleged that the district failed to offer the student a free appropriate public education (FAPE) for the 2013-14, 2014-15, and 2015-16 school years (see generally IHO Ex. I).  As relevant to this decision, the parents asserted that the BOCES TSP with BASIS program was not appropriate to address the student's special education needs, particularly the student's need for supervision and structure (id. at pp. 18, 21-28).  Rather, the parents alleged that a "residential setting was the appropriate placement to meet [the student's] unique learning and behavioral needs" (id. at p. 19).  The parents contended that, although the September 2014 psychological evaluation report was not available at the time of the June 2014 CSE meeting, the district failed to reconvene a CSE meeting to review the private psychologist's report (id. at pp. 23-24).  The parents argued that Grove was an appropriate placement for the student and that equitable considerations supported their request for relief (id. at pp. 29-35).  As relief, the parents requested reimbursement for the costs of the student's tuition at Grove for the 2013-14 and 2014-15 school years, as well as summer 2015 (id. at p. 35).

---

[4] By letter dated May 20, 2015, the district advised the parents that the student's completion of the program at Grove would be equivalent to a New York State local diploma (Dist. Ex. 13).

[5] After graduation, the student enrolled in college (see Tr. p. 1099; Parent Ex. NN at p. 1).

**B. Impartial Hearing Officer and State Review Officer Decisions**

After three prehearing conferences, the parties proceeded to an impartial hearing on October 14, 2015, which concluded on November 7, 2016 after nine days of proceedings (IHO Decision I at pp. 1-2; July 8, 2015 Tr. pp. 1-11; Tr. pp. 1-1539).[6]  By decision dated June 29, 2017 ("IHO Decision I"), the IHO concluded that the district offered the student a FAPE for the 2013-14 school year and the first portion of the 2014-15 school year, but failed to offer the student a FAPE for the portion of the 2014-15 school year beginning November 1, 2014, and for summer 2015 (IHO Decision I at p. 8).  The IHO rested his determination that the district denied the student a FAPE on his finding that the district was required to reconvene to consider the September 2014 psychological evaluation and that the district failed to establish that the BOCES TSP with BASIS was an appropriate substitute for a residential therapeutic placement in light of the September 2014 psychological evaluation and the private psychologist's testimony (see id. at pp. 12-24).  The IHO also found that Grove was an appropriate unilateral placement and that equitable considerations supported the parents' request for the costs of the student's tuition for the period of November 1, 2014 through August 2015 (id. at pp. 25-31).

In a decision dated October 2, 2017, an SRO vacated that portion of the IHO's decision that found that the district failed to offer a FAPE from November 2014 forward and that ordered the district to reimburse the parents for the costs of the student's tuition at Grove, and remanded the matter to the same IHO who issued the June 29, 2017 decision to determine the merits of the unaddressed issues regarding the provision of a FAPE to the student in the least restrictive environment (LRE) (Application of the Bd. of Educ., Appeal No. 17-065).

Specifically, in the decision remanding this matter, the SRO noted that the IHO's determination regarding the appropriateness of the June 2014 IEP was unappealed and, therefore, final and binding upon the parties.  The SRO agreed with the district that, contrary to the IHO's determination, the September 2014 psychological evaluation was an IEE.  The SRO also reviewed authority pertaining to whether a CSE would be required to reconvene to consider an IEE without a request from the parents for a CSE meeting.  The SRO found that the IHO reached his decision based on procedural grounds (pertaining to the obligation to reconvene) without citing legal authority and without engaging in a substantive analysis of whether the purported procedural violation denied the student a FAPE.  The SRO also indicated that, although the September 2014 psychological evaluation report included a new diagnosis of the student (borderline personality disorder), "the description of the student's actual emotional behaviors, symptoms and needs was similar to the student's previous IEPs, especially the June 2014 IEP calling for a therapeutic day placement at BOCES TSP with BASIS," which the SRO reiterated was an IEP deemed appropriate by the IHO—a finding which the parents did not challenge.  With regard to the necessary substantive analysis, the SRO indicated that the IHO failed to make a determination as to whether the recommended therapeutic day program with home-based supports constituted the student's LRE, as opposed to the therapeutic residential placement preferred by the parents, including the

---

[6] The hearing record includes a transcript of the prehearing conference that took place on July 8, 2015 but includes neither transcripts nor written summaries of the prehearing conferences that took place on July 31 and August 17, 2015, as required by State regulation (8 NYCRR 200.5[j][3][xi]).

extent to which the BASIS could support the student's needs.  The case was remanded, directing the IHO and the parties to:

> engage in the required fact development and analysis.  The IHO should require the parties to pay particular attention to how the private evaluator's safety concerns, as stated in her September 2014 evaluation report differed from the concerns that were before the June 2014 CSE and how they would or would not be addressed by the IEP proposal to place the student in the BOCES TSP with the BASIS placement in the time period following the district receipt of the evaluation report.

With respect to the 2015-16 school year, the SRO noted that the IHO failed to make findings about the IEPs developed for that school year and that his determination that the district failed to offer the student a FAPE for the 2015-16 school year could not rest on his finding that the district failed to reconvene the CSE to consider the September 2014 psychological evaluation, particularly since the May 2015 CSE did consider the evaluation.  Specifically, the case was remanded with the direction to the IHO and the parties to "consider the student's progress at Grove during the preceding year and whether the IDEA would require placement in a residential setting for the 2015-16 school year or whether the district's less restrictive placement recommendation should be upheld."  The SRO did go on to review and uphold the IHO's determinations that Grove was an appropriate unilateral placement and that equitable considerations supported the award of tuition reimbursement.

In conclusion, the SRO remanded the case with the direction to the parties and the IHO to address: "factual development and a redetermination of the issue of whether the BOCES TSP with BASIS setting was the student's LRE as a result of the district's receipt of the September 2014 evaluation report in October 2014."

### C. Impartial Hearing Officer Decision After Remand

Upon remand, the parties continued with the impartial hearing on May 24, 2018 (see Tr. pp. 1540-1688).  Testimony was taken from a social worker from BOCES, called by the district, who was familiar with the recommended BOCES TSP and BASIS (Tr. pp. 1558-1603).  Testimony was also taken from the private psychologist, called by the parents, who conducted the September 2014 psychological evaluation of the student, and the student's mother (Tr. pp. 1605-43, 1645-65).

In a decision dated December 18, 2018 ("IHO Decision II"), the IHO again found that the district failed to offer the student a FAPE for a portion of the 2014-15 and 2015-16 school years, and ordered the district to reimburse the parents for the costs of the student's tuition at Grove from November 1, 2014 through August 2015 (IHO Decision II at pp. 22-23).  First, the IHO reiterated his view that the September 2014 psychological evaluation was not an IEE, opining instead that the evaluation was actually a district evaluation (id. at pp. 9-10).  Based on this characterization of the evaluation as a district evaluation, the IHO found that the district "had an affirmative obligation to conduct a CSE to review and discuss the most recent and updated psychological evaluation for this student" (id. at p. 11).  The IHO found that the district's agreement to fund the September 2014

psychological evaluation rather than conduct its own was a "fatal mistake" on the district's part and "not merely a mistake on procedural grounds" (id. at p. 10).

As to the appropriateness of the recommended BOCES TSP with BASIS, the IHO found that the program provided insufficient support since it ended at 9:00 p.m., whereas the student required a 24/7 program (IHO Decision II at pp. 13-14).  Referring to that portion of the SRO's decision that described gaps in the hearing record about the private psychologist's knowledge about the recommended BOCES TSP with BASIS, the IHO opined that the SRO's remand order impermissibly shifted the burden of proof to the parents and the private psychologist to show that the recommended BOCES TSP and BASIS did not offer the student a FAPE in the LRE (id. at p. 13).  The IHO determined that he could not rely upon the testimony of the BOCES social worker because her knowledge post-dated the relevant CSE meetings and was therefore retrospective (id. at pp. 14-16).  The IHO emphasized that the testimony of the private psychologist both before and after remand "was worthy of belief and formed the basis for [his] decision" and summarized the psychologist's testimony about the student's needs and her opinion that the student needed a residential placement and that the BOCES TSP with BASIS offered insufficient support to meet the student's needs (id. at pp. 16-20).  The IHO concluded that "[t]he [district's] partial failure for the 2014-2015 school year focuses around [the private psychologist's] evaluation" and the district's failure to convene a CSE "to discuss and review such evaluation" (id. at p. 22).  Based on the foregoing, the IHO concluded that the district denied the student a FAPE for both the portion of the 2014-15 school year after November 1, 2014, as well as the summer portion of the 2015-16 school year, and ordered the district to fund the costs of the student's tuition at Grove for that period of time (id. at pp. 22-23).

## IV. Appeal for State-Level Review

The district appeals and asserts that the IHO erred in finding that the district failed to offer the student a FAPE for a portion of the 2014-15 and 2015-16 school years.  In particular, the district asserts that the IHO erred by restating his earlier opinion and disregarding the SRO's directions for remand.  The district argues that the IHO: improperly rejected the SRO's opinion that the September 2014 psychological evaluation was an IEE; erred by again holding, without citation to legal support, that the CSE was obligated to convene a CSE upon receipt of the evaluation; and repeated his conclusion determined erroneous by the SRO that the district was obliged to conduct its own evaluation if it disagreed with the September 2014 psychological evaluation.  The district contends that the IHO failed to "c[o]me to grips with the assigned task on remand—to ascertain whether the information presented" in the September 2014 psychological evaluation report was or was not significantly different from that which was already before the June 2014 CSE, which created an IEP deemed appropriate by the IHO.  The district argues that the IHO ignored testimony on remand that the student's behaviors were longstanding.  With regard to the substantive appropriateness of the BOCES TSP with BASIS, the district argues that the IHO erred in his assessment that the SRO shifted the burden of proof.  The district also asserts that the IHO erred in finding that the testimony of the BOCES social worker was retrospective.  Further, the district argues that the IHO erred in stating that the parent testified that the student would exhibit problematic behaviors at any time of the day or night, when the parent's testimony was hypothetical.

With respect to the 2015-16 recommended program and IEPs, the district seeks reversal of the IHO's determination of a denial of a FAPE and, in a footnote in its request for review, notes that the IHO did not address on remand the fact that the May and June 2015 CSEs considered the September 2014 psychological evaluation report.[7]

In an answer, the parents generally admit and deny the district's allegations and argue that the IHO's decision should be upheld in its entirety.

## V. Applicable Standards

Two purposes of the IDEA (20 U.S.C. §§ 1400-1482) are (1) to ensure that students with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living; and (2) to ensure that the rights of students with disabilities and parents of such students are protected (20 U.S.C. § 1400[d][1][A]-[B]; see generally Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 [2009]; Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 206-07 [1982]).

A FAPE is offered to a student when (a) the board of education complies with the procedural requirements set forth in the IDEA, and (b) the IEP developed by its CSE through the IDEA's procedures is reasonably calculated to enable the student to receive educational benefits (Rowley, 458 U.S. at 206-07; T.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151, 160 [2d Cir. 2014]; R.E. v. New York City Dep't of Educ., 694 F.3d 167, 189-90 [2d Cir. 2012]; M.H. v. New York City Dep't of Educ., 685 F.3d 217, 245 [2d Cir. 2012]; Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 [2d Cir. 2005]). "'[A]dequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP'" (Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 [2d Cir. 1998], quoting Rowley, 458 U.S. at 206; see T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 [2d Cir. 2009]). The Supreme Court has indicated that "[t]he IEP must aim to enable the child to make progress. After all, the essential function of an IEP is to set out a plan for pursuing academic and functional advancement" (Endrew F. v. Douglas Cty. Sch. Dist. RE-1, 580 U.S. __, 137 S. Ct. 988, 999 [2017]). While the Second Circuit has emphasized that school districts must comply with the checklist of procedures for developing a student's IEP and indicated that "[m]ultiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" (R.E., 694 F.3d at 190-91), the Court has also explained that not all procedural errors render an IEP legally inadequate under the IDEA (M.H., 685 F.3d at 245; A.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist., 553 F.3d 165, 172 [2d Cir. 2009]; Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 381 [2d Cir. 2003]). Under the IDEA, if procedural violations are alleged, an administrative officer may find that a student did not receive a FAPE only if the procedural inadequacies (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (20 U.S.C.

---

[7] The appropriateness of the parents' unilateral placement at Grove and the question of equitable considerations with respect to tuition reimbursement are not at issue in this appeal.

§ 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]; <u>Winkelman v. Parma City Sch. Dist.</u>, 550 U.S. 516, 525-26 [2007]; <u>R.E.</u>, 694 F.3d at 190; <u>M.H.</u>, 685 F.3d at 245).

The IDEA directs that, in general, an IHO's decision must be made on substantive grounds based on a determination of whether the student received a FAPE (20 U.S.C. § 1415[f][3][E][i]). A school district offers a FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction" (<u>Rowley</u>, 458 U.S. at 203). However, the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP" (<u>Walczak</u>, 142 F.3d at 130; <u>see Rowley</u>, 458 U.S. at 189). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created" (<u>Endrew F.</u>, 137 S. Ct. at 1001). The statute ensures an "appropriate" education, "not one that provides everything that might be thought desirable by loving parents" (<u>Walczak</u>, 142 F.3d at 132, quoting <u>Tucker v. Bay Shore Union Free Sch. Dist.</u>, 873 F.2d 563, 567 [2d Cir. 1989] [citations omitted]; <u>see Grim</u>, 346 F.3d at 379). Additionally, school districts are not required to "maximize" the potential of students with disabilities (<u>Rowley</u>, 458 U.S. at 189, 199; <u>Grim</u>, 346 F.3d at 379; <u>Walczak</u>, 142 F.3d at 132). Nonetheless, a school district must provide "an IEP that is 'likely to produce progress, not regression,' and . . . affords the student with an opportunity greater than mere 'trivial advancement'" (<u>Cerra</u>, 427 F.3d at 195, quoting <u>Walczak</u>, 142 F.3d at 130 [citations omitted]; <u>see T.P.</u>, 554 F.3d at 254; <u>P. v. Newington Bd. of Educ.</u>, 546 F.3d 111, 118-19 [2d Cir. 2008]). The IEP must be "reasonably calculated to provide some 'meaningful' benefit" (<u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1120 [2d Cir. 1997]; <u>see Endrew F.</u>, 137 S. Ct. at 1001 [holding that the IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances"]; <u>Rowley</u>, 458 U.S. at 192). The student's recommended program must also be provided in the LRE (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.1[cc], 200.6[a][1]; <u>see Newington</u>, 546 F.3d at 114; <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 108 [2d Cir. 2007]; <u>Walczak</u>, 142 F.3d at 132).

An appropriate educational program begins with an IEP that includes a statement of the student's present levels of academic achievement and functional performance (<u>see</u> 34 CFR 300.320[a][1]; 8 NYCRR 200.4[d][2][i]), establishes annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum (<u>see</u> 34 CFR 300.320[a][2][i], [2][i][A]; 8 NYCRR 200.4[d][2][iii]), and provides for the use of appropriate special education services (<u>see</u> 34 CFR 300.320[a][4]; 8 NYCRR 200.4[d][2][v]).[8]

A board of education may be required to reimburse parents for their expenditures for private educational services obtained for a student by his or her parents, if the services offered by the board of education were inadequate or inappropriate, the services selected by the parents were appropriate, and equitable considerations support the parents' claim (<u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 [1993]; <u>Sch. Comm. of Burlington v. Dep't of Educ.</u>, 471 U.S. 359, 369-

---

[8] The Supreme Court has stated that even if it is unreasonable to expect a student to attend a regular education setting and achieve on grade level, the educational program set forth in the student's IEP "must be appropriately ambitious in light of his [or her] circumstances, just as advancement from grade to grade is appropriately ambitious for most children in the regular classroom. The goals may differ, but every child should have the chance to meet challenging objectives" (<u>Endrew F.</u>, 137 S. Ct. at 1000).

70 [1985]; <u>R.E.</u>, 694 F.3d at 184-85; <u>T.P.</u>, 554 F.3d at 252).  In <u>Burlington</u>, the Court found that Congress intended retroactive reimbursement to parents by school officials as an available remedy in a proper case under the IDEA (471 U.S. at 370-71; <u>see</u> <u>Gagliardo</u>, 489 F.3d at 111; <u>Cerra</u>, 427 F.3d at 192).  "Reimbursement merely requires [a district] to belatedly pay expenses that it should have paid all along and would have borne in the first instance" had it offered the student a FAPE (<u>Burlington</u>, 471 U.S. at 370-71; <u>see</u> 20 U.S.C. § 1412[a][10][C][ii]; 34 CFR 300.148).

The burden of proof is on the school district during an impartial hearing, except that a parent seeking tuition reimbursement for a unilateral placement has the burden of proof regarding the appropriateness of such placement (Educ. Law § 4404[1][c]; <u>see</u> <u>R.E.</u>, 694 F.3d at 184-85).

## VI. Discussion

### A. 2014-15 School Year

In remanding this case for further record development on the issue of whether the district's program for the student reflected in the June 2014 IEP, and determined to be appropriate by the IHO in the first IHO decision, remained substantively appropriate in light of the additional evaluative information provided to the CSE by the parents in October 2014, the SRO noted that the IHO had found a FAPE violation solely on procedural grounds while sidestepping the substantive issue of whether the September 2014 psychological evaluation report contained any new information that not only procedurally would have obligated the CSE to reconvene but would also have been compelling enough substantively to constitute a denial of FAPE if the CSE had reconvened and again declined to recommend a residential placement for the student for the remainder of the 2014-15 school year (Tr. pp. 127-28; Dist. Ex. 12; <u>Application of the Bd. of Educ.</u>, Appeal No. 17-065).  Stated somewhat differently, the SRO found that, by primarily relying on procedural grounds, such as the September 2014 psychological evaluation report's status as something other than an IEE, the district's purported obligation to reconvene on that basis and to hear from the private evaluator at a CSE meeting, as well as the district's further obligation to perform its own evaluation of the student if it continued to disagree with the private evaluator, the IHO failed to develop the record with respect to an issue "critical" in the case: whether the September 2014 psychological evaluation report contained any new substantive information about the student that compelled not only a reconvene but also a recommendation for a change to a residential placement because the BOCES TSP with BASIS was no longer the student's LRE.

### 1. District's Receipt of the September 2014 Psychological Evaluation

As an initial matter, given the nature of the remand order and the SRO's focus therein on distinguishing the procedural and substantive elements of the relevant inquiry, I find that the SRO in the previous appeal did not reach a final decision on the issue of whether the CSE had a procedural obligation to reconvene upon receipt of the September 2014 psychological evaluation report.  The SRO in the previous appeal focused on the district's obligation to reconvene the CSE based on his finding that the evaluation was an IEE.  After remand, the IHO found that the September 2014 psychological evaluation was a district evaluation and, therefore, that the CSE had an obligation to reconvene to review it (IHO Decision at pp. 9-11).  Ultimately, however, I do

not find that the characterization of the evaluation as either an IEE, a private evaluation, or a district evaluation is determinative in this instance.[9]

As a general matter, in addition to a district's obligation to review the IEP of a student with a disability periodically but at least annually, the IDEA and federal and State regulations also require a CSE, upon review, to revise a student's IEP as necessary to address: "[t]he results of any reevaluation"; "[i]nformation about the child provided to, or by, the parents" during the course of a review of existing evaluation data; the student's anticipated needs; or other matters (20 U.S.C. 1414[d][4][A]; 34 CFR 300.324[b][1][ii][C]; 8 NYCRR 200.4[f][2][ii]).  Further, either an IEE or a private evaluation obtained at private expense "[m]ust be considered by the school district, if it meets the school district's criteria, in any decision made with respect to the provision of a [FAPE] for the student" (8 NYCRR 200.5[g][1][vi][a]; see 34 CFR 300.502[c][1]).  State regulations additionally provide that, if parents believe that their child's placement is no longer appropriate, they "may refer the student to the [CSE] for review" (8 NYCRR 200.4[4]).  In a guidance letter, the United States Department of Education indicated that it is the district's responsibility to determine when it is necessary to conduct a CSE meeting but that parents may request a CSE meeting at any time and, if the district determines not to grant the request, it must provide the parents with written notice of its refusal, "including an explanation of why the [district] has determined that conducting the meeting is not necessary to ensure the provision of FAPE to the student" (Letter to Anonymous, 112 LRP 52263 [OSEP Mar. 7, 2012]; see 34 CFR 300.503; 8 NYCRR 200.5[a]).  As the SRO noted in the decision remanding this matter, the United States Department of Education's Office of Special Education Programs has indicated that "[g]enerally, an IEP meeting must take place before a proposal to change the student's placement can be implemented" (Letter to Green, 22 IDELR 639 [OSEP 1995]).

None of the foregoing authority requires a district to convene a CSE within a specified period of time upon completion or receipt of an evaluation, whether that evaluation be a district evaluation, a private evaluation, or an IEE.  Further, with respect to the specific facts of this matter, the parents did not request a CSE meeting to discuss the report and, between the time the district received the evaluation report and the May 2015 CSE meeting, the district did not make any new decision with respect to the provision of a FAPE to the student and did not attempt to implement a change in the student's placement.  To the extent the results of the September 2014 psychological evaluation constituted the results of a reevaluation, the CSE was required to review it at its annual

---

[9] Even if the characterization of the evaluation as a district evaluation would support a different result in this instance, I would nevertheless find that the IHO erred in making that finding on remand since the SRO in the decision before remand found that the evaluation was an IEE and did not leave the issue open for the IHO to revisit (Application of the Bd. of Educ., Appeal No. 17-065).  In other words, the doctrine of the law of the case would generally have prohibited the IHO from revisiting the issue regarding the characterization of the evaluation (see Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist., 2013 WL 3929630, at *8 [S.D.N.Y. July 30, 2013]).  The doctrine of the law of the case is intended to avoid retrial of issues that have already been determined within the same proceeding (People v. Evans, 94 N.Y.2d 499, 502-04 [2000] [noting that law of the case has been described as "'a kind of intra-action res judicata'"]; see Lillback v. State of Conn. Dep't of Educ., 397 F.3d 77, 94 [2d Cir. 2005]; Cone v. Randolph Co. Schs. Bd. of Educ., 657 F. Supp. 2d 667, 674-75 [M.D.N.C. 2009]; see generally Application of a Child with a Disability, Appeal No. 98-73 [noting that a pendency determination by an SRO would not be reopened during the proceeding once it was decided]).  Moreover, at no point in this proceeding have the parents argued that the evaluation was a district evaluation, asserting even in the present appeal that it was an IEE (see Parent Mem. of Law at p. 2).

or periodic review and revise the IEP at such review only "as appropriate" (see 20 U.S.C. 1414[d][4][A]; 34 CFR 300.324[b][1]; 8 NYCRR 200.4[f]; see also Kings Local School Dist., Bd. of Educ. v. Zelazny, 325 F.3d 724, 731 [6th Cir. 2003] [noting that "[t]he federal courts have said little on the failure to revise programs, but the school district is required to revise the programs as appropriate"]).  On the whole, the hearing record does not indicate that the CSE was required to reconvene a CSE meeting and, even if the district was procedurally obligated to reconvene the CSE, the hearing record also does not support a finding that the failure to do so in this instance (a) impeded the student's right to a FAPE, (b) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE to the student, or (c) caused a deprivation of educational benefits (see 20 U.S.C. § 1415[f][3][E][ii]; 34 CFR 300.513[a][2]; 8 NYCRR 200.5[j][4][ii]).  That is, the hearing record does not indicate that, had the CSE reviewed the September 2014 psychological evaluation report upon its receipt thereof, it would have warranted a revision to the student's IEP.  This is particularly so, in light of the now final and binding determination that the recommendations of the June 2014 CSE were appropriate, which recommendations were based on similar information about the student's needs as set forth in the September 2014 psychological evaluation.  In particular, the evidence in the hearing record supports a finding that the behavioral, social/emotional, and related academic needs of the student known to the June 2014 CSE were similar as well as consistent with the student's behavioral, social/emotional, and related academic needs as identified in the September 2014 psychological evaluation report (compare Dist. Ex. 12, with Parent Ex. Y, and Dist. Exs. 4 at pp. 2, 4-7; 7; 8; 11; 19; 20; 21).  Notably, the June 2014 CSE took place on June 13, 2014, which was within a month of the private psychologist's five-day evaluation of the student between June 24, 2014 and July 2, 2014 (Dist. Exs. 4 at p. 1; 12 at p. 1).  As set forth below, the June 2014 CSE was aware of all the student's behaviors reported by the private psychologist and the negative impact of such behaviors on the student's academic and social/emotional performance.

As summarized in more detail in the SRO's decision before remand, the June 2014 CSE considered March 2014 letters from the student's Grove psychiatrist and therapist, and a June 2014 letter from the parents, all of which identified similar needs related to social/emotional functioning as put forth in the September 2014 psychological evaluation report (compare Dist. Ex. 12, with Dist. Exs. 19; 20; 21; see Dist. Ex. 4 at pp. 2, 7).  According to the March 2014 letter from the Grove therapist, at that time, the student continued to exhibit "the most difficulty with her interpersonal relationships," and sustaining healthy boundaries with peers and adults (Dist. Ex. 20 at p. 2; see Dist. Ex. 4 at p. 7).  Additionally, the letter indicated that home visits and family communication continued to be a significant treatment theme (Dist. Ex. 20 at p. 2; see Dist. Ex. 4 at p. 7).  The March 2014 letter from the Grove psychiatrist indicated that the student had learned "a lot about how to prevent and manage dysregulated mood" and manage stressors "so as not to trigger bipolar exacerbations" (Dist. Ex. 19; see Dist. Ex. 4 at p. 7).  The June 2014 CSE reviewed a June 2014 letter written by the parents, which indicated that, "prior to attending Grove," the student had threatened her family members with physical harm, threatened to engage in self-injurious behavior, threw large objects at the parent while in the car, and caused extensive damage to the furnishings and interior of the home (Dist. Ex. 21 at p. 3; see Dist. Ex. 4 at p. 2).  According to the parents' letter, home visits from Grove continued to present significant challenges for the student as she expressed she could not "function," felt like engaging in self-injurious behavior, and stole clothing, money, jewelry and other household items during visits (Dist. Ex. 21 at p. 3).

On appeal, the district asserts that the September 2014 psychological evaluation report, while setting forth information about the student's needs including reference to episodes of self-injurious behavior while the student was home during the winter break from school during the 2013-14 school year and a diagnosis of a borderline personality disorder, did not contain information about the student's underlying needs about which the June 2014 CSE had not been aware. Although the information available to the June 2014 CSE did not specifically reference the student's more recent episode of self-injurious behavior, the hearing record shows that the district was aware that the student had engaged in that behavior in the past (Dist. Exs. 1 at pp. 2, 7; 2 at p. 8; 3 at p. 5; 9 at p. 3; see Dist. Ex. 21 at p. 3). While the September 2014 psychological evaluation report indicated that the student "hid" the evidence of her behavior, which the evaluator opined made the student's "suicidal risk significant," the hearing record shows that the district had been aware of the student's risk for suicidal ideation since May 2012 (Dist. Exs. 9 at p. 3; 21 at p. 3).

Turning to the private psychologist's September 2014 diagnosis of a borderline personality disorder, review of the evaluation report shows that the evaluator went through a differential diagnosis analysis between a mood disorder—including bipolar disorder—and a personality disorder (Dist. Ex. 12 at pp. 24-27). After providing a description of both disorders, the private psychologist indicated that the student met the diagnostic criteria for a borderline personality disorder, defined in the report as "a pervasive pattern of instability of interpersonal relationships, self image and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts" (id. at p. 26). She further defined the disorder as

> stable, pervasive, and inflexible patterns of perception, thinking and behavior that cause serious distress. The patterns involve interpersonal relationships, cognitive style and the interplay between impulses, feelings and behavior. People with personality disorders are difficult to live with (or be with) and their behavior worsens with change and/or stress. In addition, people with [borderline personality disorder] often "split" – that is view the world in black and white terms and regard people as either good or bad or friend or enemy (the roles can often switch abruptly (idealization and devaluation). Emotions are often unstable resulting in intense irritability or anxiety lasting hours to days. The core of borderline personality disorder is often chronic emptiness. The person is always searching for something to enliven them and these behaviors could be seen as obsessive, addictive, and impulsive.

(id.).

The private psychologist also reported that the student displayed a "pattern of unstable and intense interpersonal relationships characterized by vacillations between idealization and devaluation, identity disturbance with markedly and persistently unstable sense of self, impulsivity in sex, reckless behavior, eating issues, recurrent suicidal behavior, gestures or threats of self-mutilating behaviors, affective instability due to a marked reactivity of mood, inappropriate intense anger, transient, stress-related paranoid ideation," concluding that the student "would most likely fit into both diagnostic categories" of the previously diagnosed bipolar mood disorder and a

borderline personality disorder (Dist. Ex. 12 at p. 26).  Ultimately, even though the private psychologist offered a new diagnosis of the student, federal and State regulations do not require a district to focus on a student's diagnoses when developing an IEP; instead, they require the district to "gather functional, developmental, and academic information" to assist in determining whether the student is a student with a disability, and in developing an IEP that will enable the student to "be involved in and progress in the general education curriculum" (34 CFR 300.304[b][1]; 8 NYCRR 200.4[b][1]; see Fort Osage R-1 Sch. Dist. v. Sims, 641 F.3d 996, 1004 [8th Cir. 2011]). Review of the hearing record shows that, since the time of her initial CSE evaluation in 2012, the CSE had been aware of the student's significant difficulty with interpersonal relationships, sexualized and inappropriate behaviors, recurrent self-harm and suicidal ideation, intense anger and mood swings, and family relationships (compare Dist. Ex. 12 at pp. 26, with Parent Ex. D and Dist. Exs. 1 at pp. 2, 7; 2 at pp. 2-4, 7-8; 3 at pp. 5-6; 9; 11 at p. 2; 19; 20; 21).  Although the private psychologist reported that the student's "current level of symptomatology [was] a reflection of the severity of the dual diagnosis," the "symptomatic" behaviors indicated in the report—self-injurious, suicidal ideation, co-dependent peer relationships, intense reactions bordering on paranoid tendencies—were, as described above, behaviors previously known to the CSE (compare Dist. Ex. 12 at pp. 26, with Parent Ex. D, and Dist. Exs. 1 at pp. 2, 7; 2 at pp. 2-4, 7-8; 3 at pp. 5-6; 4 at pp. 2, 4, 7; 9; 11 at p. 2; 19; 20; 21).

Next, the private psychologist recommended a "therapeutic residential program in order to provide [the student] with an appropriate education" (Dist. Ex. 12 at p. 28).  Specifically, the private psychologist indicated that the student regressed to self-harm behaviors and suicidal gestures when "temporarily out of her 24 hour/ 7 day a week therapeutic environment," and stated that a "residential setting is necessary to provide a safe environment to promote learning, coping, appropriate socialization, to provide alternative learning experiences, and to enable [the student] to determine more age appropriate independent living and coping strategies" (id. at pp. 27-28). Review of the rationale for the private psychologist's residential placement recommendation shows that it is similar to the reasons stated in the Grove clinicians' March 2014 reports—concerns regarding the student's self-injurious behaviors when stressed, problematic interpersonal relationships, as well as psychological and academic needs—which was information already known to the CSE (compare Dist. Ex. 12 at pp. 27-28, with Dist. Exs. 4 at pp. 2, 4, 7; 19; 20).

Furthermore, the student's educational needs related to her psychological and academic profile were relatively consistent over the two years leading up to the June 2014 CSE meeting, wherein those CSEs made similar day treatment and BASIS program recommendations as compared to the June 2014 CSE (compare Dist. Ex 4, with Dist. Exs. 2; 3).  Specifically, the CSEs from previous school years, namely the August 2012 and May 2013 CSEs, reflected the student's behaviors and social/emotional difficulties in the corresponding IEPs akin to those identified in the September 2014 psychological evaluation report, and, as with the June 2014 CSE, recommended similar programs (compare Dist. Ex. 12, with Dist. Exs. 2; 3; 4; see In re Katonah-Lewisboro Sch. Dist., 2016 WL 4939559 [S.D.N.Y. Sept. 14, 2016] [finding the program recommended in the August 2012 IEP to be appropriate]).  Additionally, I note that discussion at the June 2014 CSE meeting indicated that, despite continued difficulties with interpersonal and family relationships, the student was "doing very well this year," she had successfully joined a school sports team, was appropriately progressing with "check-ins" with staff, and engaged in transition to college activities (Dist. Ex. 4 at pp. 1-2).

Based on the foregoing, the evidence in the hearing record supports a finding that, even if the CSE was obligated to convene before the deadline for the student's annual review in order to review the September 2014 psychological evaluation, the information in the evaluation report would not have required a revision of the student's IEP since it presented similar information about the student as known to the June 2014 CSE and in light of the district's obligation to recommend a program in the LRE, as discussed below.

## 2. Least Restrictive Environment

The SRO remanded the matter to the IHO for further fact development and analysis, particularly "whether the BOCES TSP with BASIS setting" remained the student's LRE in light of the district's subsequent receipt of the September 2014 psychological evaluation report in October 2014 (Application of the Bd. of Educ., Appeal No. 17-065).

Because the IHO adjudged the recommended BOCES with BASIS program to be inappropriate based on the private psychologist's opinion that the student needed the support of a therapeutic residential placement in order to receive a FAPE, LRE considerations are implicated. The IDEA requires that a student's recommended program must be provided in the LRE (20 U.S.C. § 1412[a][5][A]; 34 CFR 300.107, 300.114[a][2][i], 300.116[a][2], 300.117; 8 NYCRR 200.1[cc], 200.6[a][1]; see T.M., 752 F.3d at 161-67; Newington, 546 F.3d at 111; Gagliardo, 489 F.3d at 105; Walczak, 142 F.3d at 132; Patskin v. Bd. of Educ. of Webster Cent. Sch. Dist., 583 F. Supp. 2d 422, 428 [W.D.N.Y. 2008]). In determining an appropriate placement in the LRE, the IDEA requires that students with disabilities be educated to the maximum extent appropriate with students who are not disabled and that special classes, separate schooling, or other removal of students with disabilities from the general educational environment may occur only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily (20 U.S.C. § 1412[a][5][A]; see 34 CFR 300.114[a][2][i], 300.116[a][2]; 8 NYCRR 200.6[a][1]; Newington, 546 F.3d at 112, 120-21; Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist., 995 F.2d 1204, 1215 [3d Cir. 1993]; J.S. v. N. Colonie Cent. Sch. Dist., 586 F. Supp. 2d 74, 82 [N.D.N.Y. 2008]; Patskin, 583 F. Supp. 2d at 430; Watson v. Kingston City Sch. Dist., 325 F. Supp. 2d 141, 144 [N.D.N.Y. 2004]; Mavis v. Sobol, 839 F. Supp. 968, 982 [N.D.N.Y. 1993]). The placement of an individual student in the LRE shall "(1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) be as close as possible to the student's home" (8 NYCRR 200.1[cc]; 8 NYCRR 200.4[d][4][ii][b]; see 34 CFR 300.116). Consideration is also given to any potential harmful effect on students or on the quality of services that they need (34 CFR 300.116[d]; 8 NYCRR 200.4[d][4][ii][c]). Federal and State regulations also require that school districts ensure that a continuum of alternative placements be available to meet the needs of students with disabilities for special education and related services (34 CFR 300.115; 8 NYCRR 200.6). The continuum of alternative placements includes instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions; the continuum also makes provision for supplementary services (such as resource room or itinerant instruction) to be provided in conjunction with regular class placement (34 CFR 300.115[b]).

With respect to residential placements, the Second Circuit has stated that "[w]hile some children's disabilities may indeed be so acute as to require that they be educated in residential

15

facilities, it is appropriate to proceed cautiously whenever considering such highly restrictive placements. . . . The norm in American public education is for children to be educated in day programs while they reside at home and receive the support of their families" (Walczak, 142 F.3d at 132). A residential placement is not appropriate unless it is required for a student to benefit from his or her educational program (M.H. v. Monroe-Woodbury Cent. Sch. Dist., 296 Fed App'x 126, 128 [2d Cir. Oct. 7, 2008]; Walczak, 142 F.3d at 122; Mrs. B., 103 F.3d at 1121-22; see Educ. Law § 4402[2][b][2]; 34 CFR 300.104; 8 NYCRR 200.6[j][1][iii][d]). In general, the Second Circuit has required objective evidence that a student cannot obtain an educational benefit in a less restrictive setting before finding that a residential placement is required by the IDEA (see M.H., 296 Fed. App'x at 128; Walczak, 142 F.3d at pp. 131-32).

The district asserts that the BOCES TSP with BASIS program was an appropriate recommendation to address the student's needs in the LRE during the 2014-15 school year, even with consideration of the September 2014 psychological evaluation results. The parents assert that the private psychologist believed the lack of 24-hour support was not appropriate to meet the student's needs related to safety.

The June 2014 IEP indicated that the CSE recommended the BASIS program be delivered at the student's home, on a daily basis throughout the school year, both before and after school (Dist. Ex. 4 at p. 10). The June 2014 CSE meeting information summary attached to the IEP indicated that the CSE provided a description of the BASIS program (id. at p. 2).[10] The meeting information summary indicated that BASIS staff—composed of a supervising school psychologist and certified teachers and teaching assistants, all of whom have had training in therapeutic crisis intervention—worked directly with families to provide support for school avoidance and homework issues (id. at pp. 2-3). According to the meeting information summary, the BASIS team went into the home before school to establish routines to support getting students up and ready for school, and modeled appropriate ways for parents to interact with their child (id. at p. 2). The BASIS program also provided after-school support to help establish a structured setting to assist with homework completion and to assist parents with developing skills to successfully interact with their child (id.).

During the impartial hearing after remand, a BOCES social worker testified about the BASIS program (see Tr. pp. 1558-1603).[11] The social worker testified about the BASIS program based upon her knowledge as a BASIS provider to students and their families during the 2014-15 school year (Tr. p. 1560).[12] She testified that BASIS providers, in conjunction with the family, determined a schedule that "worked" for them regarding when the services would be provided (Tr. p. 1561). Testimony of the social worker reflects that BASIS could be available as early in the

---

[10] The CSE had also recommended provision of the BASIS at both the August 2012 and May 2013 CSE meetings, which the parents attended, and in the resultant IEPs (Dist. Exs. 2 at pp. 1, 11; 3 at pp. 1, 9). Moreover, in the meeting information summary attached to the August 2012 IEP, the CSE discussed that the BASIS program would "provide support to the family in gaining skills and strategies necessary to address [the student's] history of non-compliance with getting up and ready for school" (Dist. Ex. 2 at p. 2).

[11] In addition, on remand, the district submitted one exhibit into the hearing record: a resume of the BOCES social worker who testified regarding the BASIS program (Dist. Ex. 34 at pp. 1-2).

[12] The social worker testified that she did not know the student (Tr. p. 1585).

morning as needed to get a student to school, until approximately 9:00 pm and on weekends, but that the BASIS program was not considered 24-hour support (Tr. pp. 1561-62, 1575, 1591, 1600-01).  Providers of BASIS included psychologists, social workers, and school counselors who could, according to the social worker, provide "clinical counseling," as well as teachers who provided direct instruction and teacher assistants/aides (Tr. p. 1563).

The social worker testified that BASIS assisted students and families with parent training and academic tasks but that the majority of students served during the 2014-15 school year were "school avoidant" (Tr. pp. 1561-63).  She further testified that, to address students' needs related to school avoidance, providers used a multilayer intervention including use of behavioral strategies such as a rewards-based system, and consequences provided by the parents when a student refused to attend school (Tr. pp. 1563-64).  Specific to school avoidant behaviors, the social worker testified that a provider and the family develop a strategy, the provider models how to provide that strategy, and then supports the family in following through with that intervention (Tr. p. 1565).  During the 2014-15 school year, the BASIS program served students—some of whom had also received diagnoses of bipolar and personality disorders—who exhibited behaviors similar to the student including school avoidant, self-injurious, violent and threatening behaviors and who engaged in inappropriate interpersonal relationships and displayed poor hygiene (Tr. pp. 1563-64, 1567-68, 1573-74; Dist. Ex. 4 at pp. 2, 7).  BASIS providers also worked in conjunction with a student's "outside" therapist and psychiatrist to manage behaviors such as threats made to family members (Tr. p. 1568).

The parents argue that the testimony of the BOCES social worker is impermissibly retrospective and that the IHO correctly treated it as such (see IHO Decision II at p. 14); however, because the June 2014 IEP identified the BASIS program as being part of the student's recommended services and the meeting information summary attached to the IEP described some of the program's features, indicating it included the provision of supports to the student and family regarding homework completion and school avoidance, testimony describing the manner in which such supports were available in the district proposed program and school does not constitute after-the-fact testimony used to "rehabilitate a deficient IEP"; instead, the testimony "explains or justifies the services listed in the IEP" and, thus, may be considered (see Dist. Ex. 4 at pp. 2-3, 10; R.E., 694 F.3d at 186, 188; see also E.M. v. New York City Dep't of Educ., 758 F.3d 442, 462 [2d Cir. 2014] [explaining that "[b]y way of example, we explained that 'testimony may be received that explains or justifies the services listed in the IEP,' but the district 'may not introduce testimony that a different teaching method, not mentioned in the IEP, would have been used'"] [internal citations omitted]; P.C. v. Rye City Sch. Dist., 232 F. Supp. 3d 394, 416 [S.D.N.Y. 2017] [noting that the "few additional details" about the CSE's recommendations described in testimony did not materially alter the written plan or prevent the parents from making an informed decision]).  The testimony of the social worker generally explained BASIS in a manner consistent with the IEP (Dist. Ex. 4 at pp. 2, 10; see R.E., 694 F.3d at 186-88).  To the extent the social worker's testimony went beyond the bounds of explaining BASIS as listed in the IEP, it has not been relied upon.

In finding that the BOCES TSP with BASIS was not appropriate due to lack of around-the-clock support, the IHO referred to the private psychologist's testimony regarding the student's need for "24/7 coverage" in fall 2014 and spring 2015 because "her symptoms were potentially life threatening" (IHO Decision II at p. 17; see Tr. p. 1622; see also Tr. pp. 1629, 1637-38, 1641-42).  The private psychologist stated that a day program would not be appropriate for the student

because the student's "symptoms were evident throughout the day and the evening and the night and w[eren't] limited to a . . . day period of time" (Tr. pp. 1627, 1642). She further testified that she "felt very strongly that the safety issues and the intensity of [the student's] symptoms made day treatment not a viable option" (Tr. p. 1627). With respect to her opinion that BASIS was insufficient to meet the student's needs, the private psychologist testified that she was not familiar with BASIS prior to June 2015, but that subsequent to that time she understood that BASIS provided assistance to students in getting to school in the morning and could include after-school assistance provided by BOCES staff (Tr. pp. 1611-12, 1619). The private psychologist testified that she would be very concerned about a clinical social worker assisting the student in the home setting with school avoidant behaviors based upon the student's emotional reactivity, the amount of regression and physical reaction she had shown in the past, and the danger to herself and to the family related to the student's "rage" reactions (Tr. pp. 1619-20). According to the private psychologist, the student would resume self-injurious behaviors and there would be issues with violence in the home if she were to attend a program that included BASIS (Tr. pp. 1620-21).[13]

However, the private psychologist also testified that the "symptoms and behaviors" she referred to had been "evident and demonstrated" by the student for many months prior to the private psychologist's evaluation, and that specifically the student's self-injurious behavior had been "exhibited back for several years" prior to the psychological evaluation and was an "enduring symptom" (Tr. pp. 1627-28).[14] Additionally, the private psychologist testified that, between the time of the June 2014 CSE meeting and her September 2014 psychological evaluation report, she was not aware of the student being hospitalized for psychiatric difficulties, or engaging in self-injurious, suicidal, violent, or "potentially life-threatening" behaviors (Tr. pp. 1623-25). As discussed above, the rationale for the private psychologist's residential placement recommendation in the September 2014 psychological evaluation report appears to have been based upon the student's negative behaviors, which were well known to the CSE and determined to be appropriately addressed with the program and placement recommended in the June 2014 IEP (compare Dist. Ex. 12 at pp. 2-3, 26-28, with Dist. Exs. 4 at pp. 2, 7; 19; 20; 21).

Without diminishing the seriousness of the student's needs, the foregoing evidence does not support a finding that the district's receipt of the September 2014 psychological evaluation report caused the BOCES TSP with BASIS to cease being an appropriate recommendation for the student. Therefore—assuming the CSE was required to convene after the district received the evaluation—its failure to do so did not rise to the level that the student was denied a FAPE in the LRE. Neither the evaluation nor the testimony of the private psychologist set forth sufficient objective grounds to rebut the district's evidence on this point or to otherwise justify a determination that, instead, a recommendation for a residential placement was necessary (see

---

[13] As described above, the IHO indicated his belief that the SRO's decision remanding the matter impermissibly shifted the burden of proof to the parents by expecting the private psychologist to testify about her knowledge of the recommended BOCES TSP with BASIS (IHO Decision II at p. 13). However, the private psychologist presented her opinion of the recommended BOCES TSP with BASIS and the expectation that a witness articulate a foundation for an opinion does not constitute a shifting of the burden of proof (see Fed. R. Evid. 701, 702).

[14] Additionally, the private psychologist testified that the September 2014 diagnosis of a borderline personality "didn't make the situation worse," rather, it was "the observable behaviors" that met the clinical criteria for the diagnosis and that the correct diagnosis had "significant treatment implications" (Tr. p. 1621).

Educ. L. § 4402[2][b][2]; 34 CFR 300.104; 8 NYCRR 200.6[j][1][iii][d]; M.H., 296 Fed. App'x at 128; Walczak, 142 F.3d at pp. 131-32).  As the student's needs remained constant subsequent to the June 2014 CSE meeting, as described above, it would not appear that the district's receipt of the September 2014 psychological evaluation report should have alerted the CSE that the student needed a residential placement any more than the other documents recommending residential placement considered by the June 2014 CSE (compare Dist. Ex. 12, with Dist. Exs. 2; 3; 4; 9; 19; 20; 21).  Therefore, in light of the above, and in consideration of the specific questions remanded to the IHO, the evidence in the hearing record does not support a finding that the recommended BOCES TSP with BASIS program and placement for the 2014-15 school year ceased to offer the student a FAPE after the CSE received the September 2014 psychological evaluation report.

### B. 2015-16 School Year

In his decision remanding this matter, the SRO concluded the IHO failed to make distinct findings regarding the IEPs for the 2015-16 school year (Application of the Bd. of Educ., Appeal No. 17-065).  The SRO indicated that on remand the parties and the IHO should consider the student's progress at Grove during the preceding year and whether the IDEA would require placement in a residential setting for the 2015-16 school year or whether the district's less restrictive recommendation for the BOCES TSP with BASIS was appropriate (id.).  Upon remand, the IHO concluded that the district failed to offer a FAPE to the student from November 1, 2014 through August 2015 but did not separately examine the recommendations of the May and June 2015 CSEs (IHO Decision II at pp. 9, 22-23).[15]

An independent review of the information regarding the student's behavior, social/emotional functioning, and academics available to the May and June 2015 CSEs demonstrates the student did not require a more restrictive placement recommendation.  The CSE convened on May 13, 2015 and reconvened on June 11, 2015 for the student's annual review to develop an IEP for the 2015-16 school year (Dist. Exs. 5 at pp. 1, 3; 6 at pp. 1, 4).  The hearing record reflects that the May 2015 CSE considered information Grove prepared during the 2014-15 school year including comprehensive service plans, report cards, and a progress report, as well as the September 2014 psychological evaluation report (Tr. pp. 126-27, 828-29; Dist. Ex. 5 at p. 3; see Parent Exs. J at pp. 35-54; GG; HH; II; Dist. Ex. 12).[16]  For the 2015-16 school year, the June 2015 CSE recommended a 12-month school year program in an 8:1+1 special class placement in the BOCES TSP with BASIS (Dist. Ex. 6 at pp. 2, 9-10).  The CSE also recommended that the student receive one 30-minute session per week of counseling in a group and one 30-minute individual counseling session per week (id. p. 10).  The CSE further recommended a weekly psychiatric consultation for the school staff and the family (id. at p. 10).

Within the comprehensive service plan, the advisor report, which focused on the student's therapeutic program, reflected that the student had met objectives related to improving her self-awareness and self-concept and had either met or was making progress toward objectives to

---

[15] As the hearing record reflects that the student graduated from Grove on August 16, 2015 (Parent Ex. FFF at p. 1), the only portion of the 2015-16 school year that is at issue here is summer 2015.

[16] Although referenced in the May 2015 IEP (Dist. Ex. 5 at p. 3), the hearing record does not include the January 30, 2015 or July 30, 2014 comprehensive service plans, or the October 24, 2014 progress report.

develop healthy distress tolerance skills, learn effective interpersonal skills and demonstrate the ability to engage in healthy appropriate relationships, and prepare for post-secondary living and education (Parent Ex. J at pp. 44-46). The advisor report stated that, as of January 2015, the student was planning on attending a community college in fall 2015 and that she was motivated during the college process and focused on gaining maturity and skills needed for independent living (id. at p. 47). By April 2015, the advisor report indicated that the student was "doing well" as she moved toward the end of the school year, she was engaged with her academic and activity programs, and continued to work toward her treatment goals (id.). The advisor's academic program report indicated that the student demonstrated overall progress toward objectives related to applying effective study skills strategies and increasing social skills in the classroom, although she continued to need redirection and to show more consistent effort and motivation (id. at pp. 50-51). By April 30, 2015, the student had achieved the following grades: algebra II (B-), anatomy and physiology (B), English (C), life skills (A-), and physical education (A) (Parent Ex. II).

During the May 2015 CSE meeting, Grove staff participated by telephone, along with district members and the parents who attended the meeting (Dist. Ex. 5 at p. 1). According to the CSE meeting information summary attached to the IEP, the student's academic advisor from Grove reported that the student had "made a lot of progress throughout the [20]14-15 school year," including that she had increased her frustration tolerance, self-esteem and self-worth (id.). Present levels of performance reflected reports that the student "continue[d] to demonstrate improvement in her ability to comprehend and manage her mood lability," presented as "more aware of her own mood shifts," and was more likely to seek support (id. at p. 6). Additionally, the IEP reflected reports that the student "demonstrate[d] solid incremental gains in her ability to manage impulsive thoughts," adding that she "overall continue[d] to be less reactive and that incidents of impulsive acting out ha[d] lessened significantly" (id.). Although the student reportedly had occasional difficulty "dealing with her issues," the Grove advisor indicated that she had been "able to negotiate ups and down and resolve issues" (id. at p. 1). At the time of the CSE meeting, the student had been placed on a "less restrictive plan" and was independent in all activities of daily living (id.). The student had earned privileges such as walking in to town, and getting an off-campus job if she chose to do so (id.). The Grove advisor indicated that the student was demonstrating leadership skills; for example, she was participating in a play production in which she organized, created, and disseminated jobs associated with the play (id.). Overall, the Grove advisor reported that the student was taking more responsibility for her own learning, independently "regrouping" to ensure she made assignment deadlines, was "on grade level, readily accept[ed] and s[ought] out help," and was "very close to meeting the goals of the school at this point" (id. at pp. 1-2). The student's present levels of performance as set forth in the May 2015 IEP reflect Grove staff reports that the student was maintaining "an A, B average in most subjects" and that she had developed appropriate study skills (id. at p. 6). The Grove advisor further reported that the student had participated in the college search process and had been accepted at a community college, which she would begin immediately after her graduation from Grove in August 2015 (id. at p. 2).

The private psychologist also participated in the May 2015 CSE meeting by telephone and the September 2014 psychological evaluation report was reviewed (Tr. p. 130; Dist. Ex. 5 at pp. 1-2). The private psychologist reported to the CSE that the student had been "somewhat difficult to test" the previous summer, because her "mood was up and down" (Dist. Ex. 5 at p. 2). Although the private psychologist reported findings consistent with a mood/personality disorder, that the

20

student exhibited weaknesses in a number of areas including reading comprehension, and that her emotional "issues impacted" her performance, she noted that "recent information reflect[ed] that [the student] ha[d] made significant progress throughout the [20]14-15 school year" (id.).  With the exception of the reading comprehension subtest score, the student's academic achievement scores were in the average range, and the CSE specifically asked Grove staff during the meeting if the student had any reading comprehension weakness, to which they replied the student "was on grade level across the board in all academic areas" (Tr. pp. 130-31; see Dist. Ex. 12 at p. 12).[17]

The meeting information summary reflects that the May 2015 CSE reviewed the student's goals, which focused on self-regulation, coping, interpersonal skills, and transition, and her program/testing accommodations (Dist. Ex. 5 at pp. 2, 8-11).  The CSE also discussed that the student "remain[ed] eligible for programming until she either attain[ed] a NYS local or Regents Diploma, or its equivalent, or until the school year in which she turn]ed] 21 years of age" (id. at p. 2).  For the 2015-16 school year, the CSE recommended an 8:1+1 special class placement in the BOCES TSP, which the meeting information summary described as a placement that met students' needs "through highly structured classroom settings with counseling and instructional supports," as well as "access to mainstream classes as appropriate" and, "[a]t the secondary level, . . . transition services and supports and access to a clinician throughout the school day" (id. at pp. 2, 9, 12).  The meeting summary and IEP further indicated that the CSE recommended special classes for all core academic classes needed for graduation, weekly group and individual counseling services, transition planning between the program and Grove, and BASIS (id. at pp. 2, 9-10).  The meeting summary indicated that referral packets would be sent out to all appropriate programs, and that the CSE would reconvene to consider the responses, at which time BASIS staff would be invited (id. at p. 2).[18]

On June 11, 2015 the CSE reconvened (Dist. Ex. 6).  Among the participants was a school psychologist from the BOCES TSP, who participated by telephone, and a representative from BASIS (id. at p. 1).  According to the CSE meeting information summary attached to the IEP, the BOCES TSP school psychologist described the focus of the 12-month program should the student attend during summer 2015 (id. at p. 2).  Specifically, the student would enroll in an individualized program, which would include a diagnostic assessment and social/emotional supports in a therapeutic environment, where the student could work on credit recovery and Regents exam preparation (id.).  The summary indicated that, if the student did not complete the program over the summer, she could enroll in the fall and continue studies to achieve a local or Regents diploma (id.).  The BASIS representative reported that the program helped students get to school in the morning and could also provide assistance after school, including a parent counseling component (id.).

Regarding the private psychologist's recommendation for a small student-to-teacher ratio and instruction in a sequential and consistent program that provided consequences for the student's

---

[17] The director stated that the student's September 2014 cognitive and academic achievement test results were consistent with testing previously completed by the district (Tr. pp. 132-33).

[18] According to the meeting summary, the parents expressed concern about removing the student from Grove so close to her completion of the program and rejected the IEP, reserving their right to seek tuition reimbursement (Dist. Ex. 5 at p. 2).

behavior, the director testified that was something the BOCES TSP could offer (Tr. pp. 133-34; see Dist. Ex. 12 at p. 28).  The director further testified that, at the time of the 2015 CSE meetings, the student was "getting ready in two months to transition to no services at all, to a [community college]," and that she did not agree the student required a residential placement in order to achieve that goal (Tr. pp. 409-10).  According to the director, based on the Grove reports received and considered at the CSE meetings, which reflected the student had made progress, she did not see any reason why the student would not be capable of transitioning into the BOCES TSP, which she believed "might be a good step down between the residential setting and going to college" (Tr. pp. 142-43, 446-47; see Dist. Exs. 5 at pp. 1-3; 6 at p. 4).[19]  The district school psychologist, who reviewed the September 2014 psychological evaluation report, testified that she believed the private psychologist's residential placement recommendation was "overly restrictive" and that, even when the CSE convened "initially," she did not think the student's needs were at a level that she required a residential placement and "certainly, as [the student] got older and matured and improved, [she] didn't think [a residential placement] was appropriate" (Tr. pp. 520, 605).  She further testified that, based upon the data received and considered by the 2015 CSEs, she did not see any reason to change the student's recommendation for the BOCES TSP (Tr. pp. 520, 539-40).  Although the May and June 2015 CSEs declined to accept the private psychologist's residential placement recommendation, the director testified that the May 2015 CSE considered that recommendation but believed that "the least restrictive environment to meet [the student's] needs would be a therapeutic day program with supports that were offered in the home to address the situations that were occurring in the home" (Tr. p. 134; see Dist. Exs. 5 at p. 10; 6 at p. 9).

In summary, the information available to the May and June 2015 CSEs, including the September 2014 psychological evaluation report and the information from Grove, reflected that the student had made social/emotional, behavioral, and academic progress during the 2014-15 school year, such that a more restrictive placement recommendation for the 2015-16 school year was not warranted.  Therefore, the June 2015 CSE recommendation of a 12-month program in an 8:1+1 special class placement in a BOCES TSP together with BASIS and counseling services offered the student a FAPE.

## VII. Conclusion

By no means is this case an easy one as reflected by the course of the proceedings and considered opinions rendered thus far.  Ultimately, however, the student presented over the years with needs that remained relatively constant with the exception of reports of progress at Grove.  And, as the IHO indicated in his first decision, he felt constrained by the earlier determinations (including a federal court decision) about the appropriateness of the also relatively unchanged CSE recommendations for the student, absent some piece of new information that would warrant a different result (see IHO Decision I at pp. 9, 12, 17; cf. P.C., 232 F. Supp. 3d at 413-15 [examining carryover of goals and services from a student's IEP from a previous school year and noting that, "[w]here a student's needs and objectives remain substantially the same, '[i]t is especially sensible that [an IEP] would reflect continuity with [a student's] needs and objectives as of [previous

---

[19] The school psychologist testified it was "important" that the student be part of her "home community" and that a therapeutic day program would afford the student the opportunity to work on family discord issues, which would not be readily available in a residential setting (Tr. p. 606).

years,]'"], quoting <u>L.B. v. New York City Dep't of Educ.</u>, 2016 WL 5404654, at *11 [S.D.N.Y. Sept. 27, 2016]).   As the IHO felt constrained by those earlier determinations, so too the determination in this matter is very much influenced by the IHO's own determination—now final and binding—that the June 2014 IEP set forth an appropriate placement recommendation for the student.   While, for purposes of a tuition reimbursement claim, each school year must be treated separately (<u>see</u> <u>M.C. v. Voluntown Bd. of Educ.</u>, 226 F.3d 60, 67 [2d Cir. 2000] [examining the prongs of the Burlington/Carter test separately for each school year at issue]; <u>Omidian v. Bd. of Educ. of New Hartford Cent. Sch. Dist.</u>, 2009 WL 904077, at *21-*26 [N.D.N.Y. Mar. 31 2009] [analyzing each year of a multi-year tuition reimbursement claim separately]; <u>Student X v. New York City Dep't of Educ.</u>, 2008 WL 4890440, at *16 [E.D.N.Y. Oct. 30, 2008]), this is not to say that each school year exists in a vacuum (<u>see</u> <u>Application of the Dep't of Educ.</u>, Appeal No. 15-073).   In terms of a new piece of information about the student's needs that would warrant a different CSE recommendation, the September 2014 psychological evaluation report, rather than presenting a different picture of the student, described the student's needs in a manner consistent with information presented to the earlier CSEs.   While the IHO appeared to have been particularly convinced by the evaluation report and testimony of the private psychologist, his finding does not square with his earlier finding that the June 2014 IEP was appropriate.   Moreover, the district's position is further supported legally by its LRE obligations and the strong preference for educating students in day programs (<u>Walczak</u>, 142 F.3d at 132), as well as by the student's progress during the course of her attendance at Grove.

Accordingly, the evidence in the hearing record does not support the IHO's award of tuition reimbursement for Grove pertaining to the portion of the 2014-15 school year after November 1, 2014 and summer 2015 of the 2015-16 school year.   I have considered the parties' remaining contentions and find I need not reach them in light of my determinations herein.

**THE APPEAL IS SUSTAINED.**

**IT IS ORDERED** that the IHO's decision dated December 18, 2018, is modified by reversing those portions which found that the district failed to offer the student a FAPE for a portion of the 2014-15 and 2015-16 school years and directed the district to fund the costs of the student's attendance at Grove.

**Dated:**   **Albany, New York**
            **March 27, 2019**                _____
                                             **SARAH L. HARRINGTON**
                                             **STATE REVIEW OFFICER**