# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Z.Q., by his parent, G.J., et al.,<br><br>                     Plaintiffs,<br><br>          v.<br><br>NEW YORK CITY DEPARTMENT OF EDUCATION, et al.,<br><br>                     Defendants. | Case No.: 1:20-CV-09866 |

**PLAINTIFFS' FIRST SET OF REQUESTS FOR PRODUCTION
TO CITY DEFENDANTS**

Pursuant to Federal Rule of Civil Procedure 34, Plaintiffs make the following requests for production of documents to Defendants New York City Department of Education, New York City Board of Education, and Meisha Porter, in her official capacity as Chancellor of the New York City School District (collectively, "City Defendants").

**DEFINITIONS AND INSTRUCTIONS**

1.      These Requests for Production incorporate the definitions and rules of construction set forth in Local Rule 26.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

2.      "NYC DOE" means New York City Department of Education, along with New York City Board of Education, and any and all divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of the New York City Department of Education and the New York City Board of Education.

1

3.    "NY SED" means New York State Department of Education, along with New York State Board of Regents, and any and all divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of the New York State Department of Education and the New York State Board of Regents.

4.    "U.S. DOE" means the United States Department of Education, and any and all divisions or departments, agents, representatives, directors, officers, employees, committees, attorneys, accountants, and all persons or entities acting or purporting to act on behalf or under the control of the United States Department of Education.

5.     "Special education" has the meaning accorded to it by the Individuals with Disabilities Act ("IDEA") § 300.39; 20 U.S.C. § 1401(29).

6.    "English Language Learner" has the meaning accorded to it by the New York State Commissioner of Education's Regulations Part 154-1.2(a).

7.    "Multilanguage Learner" has the meaning accorded to it by the New York City Department of Education *Policy and Reference Guide for Multilingual Learners/English Language Learners, 2020-2021 School Year* (available at https://infohub.nyced.org/docs/default-source/default-document-library/ell-policy-and-reference-guide.pdf).

8.    "FAPE" or "Free Appropriate Public Education" has the meaning accorded to it by the IDEA § 300.1; 20 U.S.C. § 1401(9).

9.    "IEP" or "Individualized Education Program" has the meaning accorded to it IDEA, 20 U.S.C. § 1401(14).

10.    "Special Education Remote Learning Plans" mean the learning plans for students with IEPs that the NYC DOE required teachers to develop in April 2020 after the closure of schools due to the COVID pandemic.

11.    "PAD" means Program Adaptation Documents as the NYC DOE uses that term at https://www.schools.nyc.gov/learning/special-education/family-resources/special-education-in-blended-and-remote-settings (accessed on June 9, 2021).

12.    "RAD" means the Related Service Adaptations Documents as the NYC DOE uses that term at https://www.schools.nyc.gov/learning/special-education/family-resources/special-education-in-blended-and-remote-settings (accessed on June 9, 2021).

13.    "Remote devices" means computers, laptops, or tablets with internet capabilities that can be used for remote learning.

14.    "Impartial due process hearing," "impartial hearing," or "due process hearing" means a hearing carried out in accordance with the procedures set forth under the IDEA, 20 U.S.C. § 1415(f).

15.    "Executive Order 202.4" means Executive Order 202.4 signed by Governor Cuomo on March 16, 2020.

16.    "Executive Order 202.28" means Executive Order 202.28 signed by Governor Cuomo on May 7, 2020.

17.    "Executive Order 202.37" means Executive Order 202.37 signed by Governor Cuomo on June 5, 2020.

18.    "SESIS" means the NYC DOE's Special Education Student Information System.

19.    "You" and "Your" means of or belonging to NYC DOE, NYC Board of Education, and Meisha Porter, acting in her official capacity as Chancellor of  NYC DOE.

3

20.    The word "document" shall have the meaning ascribed to it by Rule 34(a) of the Federal Rules of Civil Procedure, and shall include, without limitation, all "writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations" that are "stored in any medium from which information can be obtained either directly or, if necessary, after translation by the responding party into a reasonably usable form."  As the term is used in these requests, "document" shall include all metadata.

21.    "And" and "or" are to be construed conjunctively or disjunctively as necessary to make the request inclusive rather than exclusive; use of a singular noun is to be construed to include the plural noun and use of a plural noun is to be construed to include the singular noun; the use of a verb in any tense is to be construed as the use of that verb in all other tenses whenever necessary to bring within the scope of the requested documents or things that which might otherwise be construed to be outside its scope.

22.    The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

23.    The term "including" means including but not limited to.

24.    The term "person" means (a) natural persons (also referred to as "individuals"); (b) legal entities, including corporations, partnerships, firms, associations, professional corporations and proprietorships; and (c) government bodies or agencies.

25.    If You believe that production of documents or things is privileged or otherwise excluded from discovery, You are requested to specify the basis of the privilege or other grounds for exclusion and to provide all other appropriate information as required by Rule 26(b)(5) of the Federal Rules of Civil Procedure.  Provide responsive documents or things to all parts of the request to which You do not object.

26.    If You cannot produce responsive documents or things to any of these requests in full, produce documents or things to the extent possible, specifying the reasons for Your inability to produce documents or things in full and provide responsive documents or things to the remainder.

27.    In producing documents or things responsive to these requests, furnish all information that is available to You, including documents or things in the possession of Your agents, employees, or attorneys, or otherwise subject to Your custody or control.

28.    If a responsive document or thing was, but no longer is, within Your possession, custody, or control, please state in detail:

a.    the type of document or thing and the author(s), sender(s), recipient(s) and copyee(s) of the document or thing;

b.    a summary of the contents of the document or thing;

c.    what disposition was made of such document or thing;

d.    the date of such disposition;

e.    whether the original or a copy thereof is within the possession, custody or control of any other person; and

f.    if the answer to (e) is affirmative, the identity of such person.

29.    Documents should be produced in accordance with the final, executed version of the production protocol for electronically stored information and paper documents currently being negotiated by the parties.

30.    Pursuant to Rule 34(b)(2)(C) of the Federal Rules of Civil Procedure, any objection in whole or in part to a request must state whether any responsive materials are being withheld on the basis of that objection, and an objection to part of a request must specify the part and permit inspection of the rest.

31.     These definitions and instructions, and the requests set forth below, apply equally to all forms of electronic communications, including e-mails, and to all other tangible things.

32.     The requests should be deemed continuing and the responses to them must be supplemented pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

33.     The time period for the requests is March 1, 2020 through the present (the "Relevant Period"), or as otherwise agreed by the parties.

### REQUESTS FOR THE PRODUCTION OF DOCUMENTS

**Request No. 1.**     All documents concerning the City Defendants' efforts, if any, to ensure that schools implement IEPs during the Relevant Period.

**Request No. 2.**     All documents concerning the City Defendants' efforts, if any, to ensure that schools and Committees on Special Education create and implement for each student with an IEP in New York City (a) Special Education Remote Learning Plans; (b) RADs; and (c) PADs, including but not limited to documents concerning the efforts to include parents in the creation and implementation of (a) – (c).

**Request No. 3.**     All documents concerning Your failures or challenges in delivering or implementing the delivery of special education services to City students with disabilities in accordance with their IEPs, Special Education Remote Learning Plans, RADs, and/or PADs during the Relevant Period.

**Request No. 4.**     All documents concerning Your process, distribution, timeline for delivery after request, or management of remote devices issued to City students with disabilities during the Relevant Period, including Your plans and policies regarding the same.

**Request No. 5.**     All documents concerning Your preparation, plans for, creation, distribution, or ongoing oversight of remote instruction materials for City students with

disabilities during the Relevant Period, including translation of the Special Education Remote Learning Plan, RAD, and PAD into parents' primary language and the language-of-instruction materials provided to English Language Learners or Multilingual Learners.

**Request No. 6.**     Documents sufficient to show the City's provision or distribution of education materials, including instructional materials, learning materials, and teaching aids to students with disabilities during school closures and remote learning in the Relevant Period, in each language in which such materials were provided, including (a) instructions regarding remote learning plans, (b) instructions regarding requesting and receiving technology, and (c) instructions regarding accessing remote learning for students.

**Request No. 7.**     All documents concerning Your efforts, including plans, approvals and related submissions, processes, and programs to reopen schools and provide students in-person special education services during the Relevant Period.

**Request No. 8.**     All documents concerning Your public statements regarding Your plans, processes, and programs to provide in-person special education services to students with disabilities during the Relevant Period.

**Request No. 9.**     All documents reflecting communications between any of Your officers, employees, agents, or representatives concerning modifications or changes to special education services programs specified in IEPs, Special Education Remote Learning Plans, RADs, or PADs, or as a result of reopening plans during the Relevant Period, including any related funding and budgetary plans.

**Request No. 10.**    All documents reflecting communications between any of Your officers, employees, agents or representatives concerning special education programs and IEPs,

Special Education Remote Learning Plans, RADs, PADs or reopening, with the NY SED, its officers, employees, agents or representatives.

**Request No. 11.**    All documents concerning Governor Cuomo's executive orders regarding the provision of educational services to students with disabilities during the Relevant Period, including Executive Orders 202.37, 202.4, and 202.28, and any other Executive Orders that are relevant to the provision of educational services to students with disabilities in New York City during the Relevant Period.

**Request No. 12.**    All documents concerning U.S. DOE guidance or statements regarding the provision of educational services to students with disabilities during the Relevant Period, including (a) the U.S. DOE guidance entitled "Questions and Answers on Providing Services to Children with Disabilities During the Coronavirus Disease 2019 Outbreak," dated March 12, 2020; (b) the U.S. DOE guidance entitled "Supplemental Fact Sheet Addressing the Risk of COVID-19 in Preschool, Elementary and Secondary Schools While Serving Children with Disabilities," dated March 21, 2020; and (c) U.S. DOE Secretary DeVos's statements, published in an announcement released by the U.S. Department of Education's Press Office on April 27, 2020, attached as Exhibit A.

**Request No. 13.**    All documents concerning New York State's guidance, memoranda, or other statements concerning  the provision of services to students with disabilities during the Relevant Period, including documents concerning (a) the memorandum from Christopher Suriano, titled "Provision of Services to Students with Disabilities During Statewide School Closure Due to Novel Coronavirus (COVID-19) Outbreak in New York State," dated March 27, 2020; (b) the supplements to the March 27 Suriano memorandum dated April 27, 2020 and June 20, 2020; (c) the "Frequently Asked Questions and Answers Regarding the Provision of Services

to Students with Disabilities During the 2020–2021 School Year," dated October 15, 2020; (d) the memorandum from Christopher Suriano, titled "2020-21 School Reopening – Instructional Models Report and Report of School Closure and Report of School Reopening for Approved Special Education Programs," last updated January 29, 2021, and (e) the memoranda from Christopher Suriano, titled "Special Education Requirements and Approaches to Address the Impacts of the COVID-19 Pandemic on Students with Disabilities," dated June 2021.

**Request No. 14.**   All documents concerning Your plans, policies, and procedures for providing in-person education for City students with disabilities who require the provision of in-person education services to progress, including Your implementation and administration of such plans, policies, and procedures, including any related funding and budget plans.

**Request No. 15.**   All documents concerning Your plans, policies, and procedures for offering extended eligibility to twenty-one-year-old and older students with disabilities to remain in school and receive special education services beyond the school year in which they turned twenty-one to make up for remote learning and school closures during the Relevant Period, including any related funding and budget plans and communications with the State Defendants.

**Request No. 16.**   Documents sufficient to show, with respect to the open complaints in the NYC DOE impartial due process hearing process (a) the number of such complaints filed during the Relevant Period, (b) the nature of the relief requested, and (c) the number of open complaints pending in the NYC DOE due process hearing system that seek relief for lost services during the Relevant Period.

**Request No. 17.**   All documents concerning policies, plans, or procedures that You have established, attempted to establish, or plan to establish as an alternative or supplement to

the impartial due process hearing process to provide compensatory services for City students with disabilities during the Relevant Period.

**Request No. 18.**    All documents concerning Your plans, policies, and procedures for providing City students with disabilities services in accordance with their IEPs during the Relevant Period, including Your implementation and administration of such plans and policies, the system for tracking whether students received all IEP mandated services, and the services You actually provided to those students.

**Request No. 19.**    Documents sufficient to show the organization of the NYC DOE, including Your special education services department.

**Request No. 20.**    All documents concerning the process by which You track the implementation of students' IEPs, Special Education Remote Learning Plans, RADs, PADs, and special education services during the Relevant Period, including SESIS.

**Request No. 21.**    All documents concerning any and all communication portals, hotline or helpline communications, website requests, or any other communication channels used to field complaints or comments regarding the receipt of remote devices during the Relevant Period, including (a) documents concerning the creation of the portal, hotline, helpline, or other similar interface, (b) complaints, exchanges, or comments between You and users of the portal, hotline, helpline, or other similar interface, and (c) policies and procedures for resolving complaints.

**Request No. 22.**    All documents concerning any and all communication portals, hotline or helpline communications, website requests, or any other communication channels or interfaces that were used to field complaints or comments regarding City students with disabilities' receipt of, or failure to receive, special education services mandated by IEPs during the Relevant Period, including (a) documents concerning the creation of the portal, hotline,

10

helpline, or other similar interface, (b) complaints, exchanges, or comments between You and
users of the portal, hotline, helpline, or other similar interface, and (c) policies and procedures
for resolving complaints.

Dated:  June 11, 2021

/s/ Joshua Kipnees

Joshua Kipnees
George A. LoBiondo
Danielle C. Quinn
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
jkipnees@pbwt.com
globiondo@pbwt.com
dquinn@pbwt.com

Rebecca C. Shore
**ADVOCATES FOR CHILDREN OF NEW
YORK, INC.**
151 West 30th Street, 5th Floor
New York, NY 10001
(212) 947-9779
rshore@advocatesforchildren.org

***Attorneys for Plaintiffs***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 11, 2021, I caused true and correct copies of Plaintiffs' First Set of Requests for Production to be served by electronic mail upon the counsel for defendants New York City Department of Education; New York City Board of Education; and Meisha Porter, in her official capacity of Chancellor of the New York City School District.


*/s/ Danielle C. Quinn*

# Exhibit A

**REPORT TO CONGRESS**

**OF U.S. SECRETARY OF EDUCATION BETSY DEVOS**

**RECOMMENDED WAIVER AUTHORITY**

**UNDER SECTION 3511(d)(4) OF DIVISION A OF THE CORONAVIRUS AID, RELIEF, AND**

**ECONOMIC SECURITY ACT ("CARES ACT")**

**April 27, 2020**

Letter of Transmittal



THE SECRETARY OF EDUCATION

WASHINGTON, DC 20202

April 27, 2020

The Honorable Lamar Alexander
Chairman
Committee on Health, Education, Labor, and
Pensions
United States Senate
Washington, D.C. 20510

The Honorable Patty Murray
Ranking Member
Committee on Health, Education, Labor, and
Pensions
United States Senate
Washington, D.C. 20510

The Honorable Richard Shelby
Chairman
Committee on Appropriations
United States Senate
Washington, D.C. 20510

The Honorable Patrick Leahy
Ranking Member
Committee on Appropriations
United States Senate
Washington, D.C. 20510

The Honorable Robert "Bobby" Scott
Chairman
Committee on Education and Labor
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Virginia Foxx
Ranking Member
Committee on Education and Labor
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Nita Lowey
Chairwoman
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Kay Granger
Ranking Member
Committee on Appropriations
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairs and Ranking Members:

In response to section 3511(d)(4) of Division A of the Coronavirus Aid, Relief, and Economic
Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), my team and
I have reviewed the Carl D. Perkins Career and Technical Education Act of 2006, the Elementary
and Secondary Education Act of 1965, the Individuals with Disabilities Education Act, and the
Rehabilitation Act of 1973 to determine what, if any, waiver authorities to recommend to Congress
to provide limited flexibility to assist States and local educational agencies to meet the needs of
students and adults with disabilities during the COVID-19 national emergency.   Though not

mentioned by that section of the CARES Act, we also reviewed the Adult Education and Family Literacy Act and provide waiver authority recommendations under that Act.

We undertook this task acknowledging the reality that most students and teachers are at home today; yet, America's teachers want to keep teaching, and students want to keep learning. They are counting on all of us to empower them to keep teaching and learning even while unable to meet in person. Accordingly, any flexibility should be strongly rooted in ensuring that learning continues, including distance learning methods, where applicable.

As we reviewed applicable Federal law, we did so with these core principles in mind:

1. The health and safety of America's students, teachers, parents, and administrators is a top priority;
2. Learning must continue for all students;
3. Decision-making must be based on what is best for students, not the "system;"
4. Parents must be informed about the impact waivers will have on their children's education and consent to those changes; and
5. Services typically or historically provided in person must naturally occur differently.

We all know that learning can—and does—happen anywhere and everywhere. With this contextual backdrop, I am pleased to make several recommendations for additional waiver authorities in this report for your consideration. Should you have any questions or concerns, I encourage you to give me a call so that we might address them together.

These are indeed challenging times; but in the face of great challenges, Americans have always risen to the occasion and embraced greatness. I know we can and will do it again. Our nation's students, parents, and educators are counting on all of us.

Sincerely,

Betsy DeVos

## Table of Contents

Background………………………………………………………………………………2

Carl D. Perkins Career and Technical Education Act of 2006………………………………..3

Adult Education and Family Literacy Act………………………………………………………6

Elementary and Secondary Education Act of 1965………………………………………...9

Individuals with Disabilities Education Act and Rehabilitation Act of 1973………………..11

**Background**

Section 3511(d)(4) of Division A of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020) requests the Secretary to provide to Congress recommendations concerning additional waiver authority for the Secretary under the Carl D. Perkins Career and Technical Education Act of 2006 (20 U.S.C. §2301 et seq.), the Elementary and Secondary Education Act of 1965 (20 U.S.C. § 6301 et seq.), the Individuals with Disabilities Education Act (20 U.S.C. § 1401 et seq.), and the Rehabilitation Act of 1973 (29 U.S.C. § 701 et seq.), to assist States and local educational agencies (LEAs) to meet the needs of students and adults with disabilities during the COVID-19 national emergency.

On March 27, 2020, the President signed the CARES Act and issued a Signing Statement, which states that the Administration will continue the practice of treating provisions like section 3511(d)(4), which requires recommendations regarding legislation to Congress, as advisory and non-binding because Article II, section 3 of the Constitution gives the President the authority to recommend only "such Measures as he shall judge necessary and expedient."   Because the Administration deems it necessary and expedient, the Secretary submits this report to Congress and also includes recommendations for waiver authority concerning the Adult Education and Family Literacy Act (29 U.S.C. § 3271 et seq.).

**Carl D. Perkins Career and Technical Education Act of 2006**

**Background**

The Carl D. Perkins Career and Technical Education Act of 2006 ("Perkins Act") – the main federal law authorizing career and technical education (CTE) programs – was most recently reauthorized in 2018 by the Strengthening Career and Technical Education for the 21st Century Act. This bipartisan measure reflected Congress' ongoing commitment to our nation's youth and adults, which has continued through annual CTE funding of nearly $1.3 billion. The Department's Office of Career, Technical and Adult Education administers the Perkins Act.

Waiver authority under the Perkins Act includes maintenance of effort (MOE) as described in section 211(b)(3) of the Act; the CARES Act authorizes the Secretary of Education ("Secretary") to grant waivers requested by State educational agencies (SEAs) and Indian tribes of section 421(b) of the General Education Provisions Act (GEPA) (commonly referred to as the "Tydings Amendment") to extend the period of availability of State-administered formula grant funds.

The CARES Act authorizes the Secretary to grant those waivers only if they are requested by an SEA that serves as the eligible agency for Perkins Act funds. Thirteen Perkins Act eligible agencies[1] are not a part of the SEA in their respective States. These eligible agencies are a part of a State workforce agency, community college system, or other stand-alone agency.

Given this context, the Department makes three recommendations for additional waiver authority to provide the flexibility to meet the needs of learners and to sustain program viability during this uncertain time.

### 1. Waiver Authority Recommendation (Period of Availability of Funds)

Section 421(b) of the General Education Provisions Act (GEPA) (20 U.S.C. § 1225(b))

**Summary of Waiver**

Waiver authority under sections 3511(a) and 3511(b)(1) of Division A of the CARES Act authorizes the Secretary to grant waivers requested by SEAs and Indian tribes of section 421(b) to extend the period of availability of State formula grant funds authorized by the Perkins Act. However, no authority was provided to waive section 421(b) with respect to Perkins Act funds under circumstances where an agency other than the SEA or Indian tribe is the grantee of such funds. This waiver authority would provide the Secretary with the authority to grant "Tydings Amendment" waivers to all Perkins eligible agencies and extend the availability of FY 2018 Perkins Act funds for obligation and liquidation beyond the 27 months required by the combination of applicable appropriations laws and section 421(b) of the GEPA.

---

[1] Colorado, Hawaii, Idaho, Indiana, Kansas, Louisiana, Minnesota, Montana, North Dakota, Oklahoma, Washington, West Virginia, and Wisconsin.

**Rationale**

This waiver authority is as critical to the non-SEA States as it is to the States that qualify under the CARES Act.  Career and technical education program closures and disruptions have limited State and local capacity to expend funds during this unprecedented time.  The thirteen states in question could potentially lose the ability to spend (or draw down and spend) $20 million in unobligated Perkins funds.  With this waiver, these States can focus on investing in the long-term rebuilding of their workforce, rather than having to be concerned about losing unspent funds due to the COVID-19 pandemic.

## 2. Waiver Authority Recommendation (Unexpended Funds)

Section 133(b)(1) of the Perkins Act (20 U.S.C. § 2353(b)(1))

**Summary of Waiver**

Under section 133(b)(1), if, in any academic year, an eligible recipient does not expend all of the amounts the eligible recipient is allocated for such year under section 131 or 132, then such recipient shall return any unexpended amounts to the eligible agency (usually the SEA) for reallocation to local recipients.  Waiving section 133(b)(1) will allow local recipients to retain unexpended funds for the 2019-2020 academic year.

**Rationale**

Given the closure of substantially all elementary and secondary schools, as well as institutions of higher education, during the spring of 2020, many local eligible recipients will not be able to expend their Perkins funds by June 30, 2020.  This waiver authority is necessary to allow local recipients to carry over unexpended funds into the 2020-2021 academic year and cover the costs of postponed investments in their CTE programs.  In the absence of a waiver, unexpended local funds will be returned to the State and redistributed by formula in the 2020-2021 or 2021-2022 academic years.

Access to the unexpended Perkins funds early in the 2020-2021 academic year would provide both K-12 and postsecondary CTE programs the critical resources necessary to jumpstart or adjust their CTE program for the new economic situation in their community.

## 3. Waiver Authority Recommendation (Professional Development)

Section 3(40) of the Perkins Act (20 U.S.C. § 2302(40))

4

**Summary of Waiver**

Section 3(40), which defines "professional development," requires that professional development be "sustained (not stand-alone, 1-day, or short-term workshops), intensive, collaborative, job-embedded, data-driven, and classroom-focused, [and] to the extent practicable evidence-based…" Waiving this definition would waive this requirement.

**Rationale**

The COVID-19 pandemic has presented immediate, unique needs for educators to meet the needs of students whose education has been severely disrupted by school closures.  With such a granular and restrictive definition, State and local recipients are not able to conduct time-sensitive, one-time or stand-alone professional development focused on supporting educators to provide effective distance learning.  Waiving the definition under the Perkins Act would enable them to do so. Congress granted similar waiver authority in the CARES Act with respect to the definition of "professional development" in the Elementary and Secondary Education Act. *See* section 3511(b)(2)(G) of Division A of the CARES Act.

## Adult Education and Family Literacy Act

**Background**

Title II of the Workforce Innovation and Opportunity Act (WIOA)--the Adult Education and Family Literacy Act (AEFLA or "Act")[2]-- is the principal source of Federal funding to States for adult education programs.  Administered by the Office of Career, Technical and Adult Education, AEFLA authorizes education services to assist adults in improving their basic skills, completing secondary education, and transitioning to postsecondary education.

The current waiver authority of the Secretary under AEFLA is limited to MOE as described in section 241(b)(4) of the Act (29 U.S.C. § 3331(b)(4)).  The CARES Act, however, authorizes the Secretary to grant waivers requested by an SEA or Indian tribe of section 421(b) of GEPA, as noted in the above discussion of the Perkins Act.  Such authority extends the period of availability of funds.

As also noted in the discussion of the Perkins Act, the CARES Act waiver authority extends to waivers for AEFLA purposes only to an SEA that is an eligible agency for AEFLA funds.  Twenty-five AEFLA eligible agencies[3] are not a part of the SEA in their respective States.  Those agencies are a part of a State workforce agency, a community college system, or other stand-alone agency.

Given the COVID-19 pandemic, the national emergency, and resulting disruption in adult education program delivery, the Department recommends three waivers to address the current needs of AEFLA eligible agencies and eligible recipients.

## 1. Waiver Authority Recommendation (Period of Availability of Funds)

Section 421(b) of the GEPA (20 U.S.C. § 1225(b))

**Summary of Waiver**

As noted earlier, the waiver authority under sections 3511(a) and 3511(b)(1) of Division A of the CARES Act authorizes the Secretary to grant waivers requested by SEAs of section 421(b) of GEPA to extend the period of availability of State formula grant funds authorized by AEFLA. However, the CARES Act does not grant waiver authority to the Secretary with respect to AEFLA funds provided to States wherein the SEA is not the grantee for such funds.  This waiver would provide the Secretary with the authority to grant "Tydings" waivers to all AEFLA eligible agencies and extend the availability of FY 2018 AEFLA funds for obligation and liquidation beyond the 27 months required by the combination of applicable appropriations laws and section 421(b) of the GEPA.

---

[2] For ease of reference, citations to Title II of the Workforce Innovation and Opportunity Act are referred to in this report as the Adult Education and Family Literacy Act (AEFLA or "Act").

[3] Alabama, Alaska, Arkansas, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Washington, Wisconsin, Wyoming, Northern Mariana Islands, and Guam.

**Rationale**

Currently, AEFLA programs nationwide are facing unprecedented local program closures and disruption that is limiting their ability to expend Federal funds. The FY 2018 Federal funds for State providers that are housed in the SEA are protected by the CARES Act waiver. The 25 States that have chosen to connect their Adult Education Program to their workforce or community college system may forfeit the unspent amount of their FY 2018 allocation, which may undercut their ability to quickly rebuild programs as America emerges from the pandemic. Waiver authority should be expanded to include non-SEA State agencies that serve as the AEFLA eligible agency.

## 2. Waiver Authority Recommendation (Within-State Distributions)

Section 222(a) of the AEFLA (29 U.S.C. § 3302(a))

**Summary of Waiver**

Section 222(a) requires the eligible agency to spend its State grant funds according to prescribed maximums and minimums. States may invest up to 5% on administration, and up to 12.5% on State leadership. A minimum of 82.5% must be spent on local grants or contracts. This waiver would let States adjust the maximum for State leadership up to 27.5% and adjust the minimum for local grants and contracts to 67.5%.

**Rationale**

Granting the Secretary the authority to waive these requirements will give States greater flexibility to respond to distance learning and temporary program closures by removing the restrictive limitations during the COVID-19 pandemic and national emergency. With the waiver authority, States would have greater latitude to shift programmatic and leadership resources for the greatest impact on learners. Eligible agencies would have greater flexibility for new Statewide investments in critical areas like distance learning capacity and professional development.

## 3. Waiver Authority Recommendation (Local Application Review)

Section 107(d)(11) of the WIOA (29 U.S.C. § 3322(d)(11))

**Summary of Waiver**

This waiver would exempt States from the requirement of seeking review and approval of local AEFLA applications by local workforce boards. Section 107(d)(11) of the Workforce Innovation and Opportunity Act requires local workforce boards to coordinate with education and training providers, in part, by reviewing applications to provide adult education and literacy services under AELFA to determine if such applications are consistent with local plans, and to make recommendations to the respective eligible agency to promote alignment with the local plan.

Further, under 34 C.F.R. § 463.21, the eligible agency is required to have processes in place to determine the extent to which a local application is aligned with a local plan.

**Rationale**

Waivers would relieve the burdens on the 36 States[4] that are conducting or temporarily postponing within-state competitions during the pandemic by streamlining the local application review process.  This change will reduce the time and burden associated with a local board's review and accommodate local areas where boards are not conducting business during the pandemic. Removing this procedural barrier from local providers will expedite implementation of new opportunities for adult learners, including integrated education and training (IET), pre-apprenticeship, and industry recognized and registered apprenticeship opportunities leading to in-demand career pathways.

---

[4] AEFLA States - Conducting competitions: Alaska, Arizona, Arkansas, California, Colorado, District of Columbia, Hawaii, Illinois, Indiana, Iowa, Kansas, Maine, Maryland, Michigan, Mississippi, Missouri, Nevada, New Hampshire, North Dakota, Pennsylvania, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, Wisconsin, and Wyoming.

Postponing competitions: Connecticut, Florida, Georgia, Idaho, Louisiana, Massachusetts, New Jersey, Puerto Rico, and Vermont.

## Elementary and Secondary Education Act of 1965

**Background**

Under section 8401 of the Elementary and Secondary Education Act of 1965 (ESEA), an SEA may request the Secretary of Education to waive any statutory or regulatory requirement of the ESEA, and the Secretary may disapprove the request only if  it fails to meet certain criteria established in section 8401(b)(4)(A) and (C) ) or if the waiver is prohibited under ESEA section 8401(c).[5]  As such, the waiver authority in the ESEA is broad; a State may request a waiver at any time, and such a waiver request will be approved so long as it meets statutory criteria for approval.

In the wake of the Presidential declaration of a national emergency on March 13, 2020, many States closed schools statewide and indicated that, based on guidelines of the Centers for Disease Control and Prevention (CDC) that discourage large gatherings, it would be very difficult to administer the annual statewide student assessments required by section 1111(b)(2) of the ESEA without risk to the health or safety of students and educators.  Without student performance data as measured by annual statewide student assessments, it would not be possible for States to meet the accountability and school identification requirements of sections 1111(c)(4)(C) and 1111(d)(2)(C)-(D), and certain reporting requirements of section 1111(h), all of which rely on that assessment data.

Given these unprecedented circumstances, on March 20, 2020, the Secretary announced she would waive assessment, accountability and school identification, and related reporting requirements and provided a waiver request template to streamline the process by which States could request a waiver under section 8401.  The waiver template allowed States to easily request waivers of the assessment requirements of section 1111(b)(2), the accountability and school identification requirements of sections 1111(c)(4)(C) and 1111(d)(2)(C)-(D), and certain reporting requirements related to assessments and accountability of section 1111(h).  Within several days of inviting the waiver requests through  the waiver template, all 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and the Bureau of Indian Education had requested and received one-year waivers relieving them of assessment, accountability, school identification, and reporting requirements.

Further, in response to additional needs communicated by SEAs to the Department, the Department invited additional waivers through a second waiver template under its authority pursuant to section 3511 of Division A of the CARES Act.  Specifically, the Secretary invited SEAs to seek relief for itself and its local subgrantees (its LEAs) from various fiscal requirements of the ESEA, including:

---

[5] Under ESEA section 8401(c), the Secretary may not waive a requirement relating to: (1) allocations or distributions of funds to States, LEAs, Indian Tribes, or other ESEA fund recipients; (2) maintenance of effort; (3) comparability of services; (4) supplement not supplant; (5) equitable participation of private school students and teachers; (6) parental participation and involvement; (7) applicable civil rights requirements; (8) requirements for charter schools in Title IV, Part C of the ESEA; (9) prohibitions in Title VIII, Part F, Subpart 2 of the ESEA, including on uses of funds prohibited in section 8526, and the prohibition on the use of funds for religious worship or instruction in section 8505; and (10) the selection of a school attendance area or school under ESEA section 1113(a)-(b), except that the Secretary may waive the requirement when the poverty level of the school attendance area or school reaches a certain threshold.

- The requirement in Section 1127(b) that limits an SEA's ability to grant its LEAs a waiver of the 15 percent carryover limitation for Title I, Part A funds more than once every three years;

- The requirement in Section 4106(d) for LEAs that receive $30,000 or more in Title IV, Part A funds to conduct a needs assessment for the 2019-2020 school year;

- The requirement in Section 4106(e)(2)(C), (D), and (E) that LEAs that receive $30,000 or more in Title IV, Part A funds meet content-specific spending requirements for FY 2019 funds and available FY 2018 carryover funds;

- The requirement in Section 4109(b) that LEAs that receive $30,000 or more in Title IV, Part A funds are subject to spending restrictions on technology infrastructure for FY 2019 funds and available FY 2018 carryover funds; and

- The definition in Section 8101(42) of "professional development," that might otherwise limit the ability to quickly train school leaders and teachers on topics like effective distance learning techniques.

The template also provided SEAs the opportunity to request a waiver of section 421(b) of GEPA, which is also available for the McKinney-Vento Homeless Assistance Act and other ED programs, as noted above.

As of April 21, 2020, all 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and the Bureau of Indian Education had requested and received waivers using the template.

Given the extensive flexibility the Department has already provided quickly and effectively to respond to the needs of SEAs and LEAs during the national emergency, given nearly all States used the template to request and receive relief from ESEA programmatic and fiscal requirements, and given the broad waiver authority in Section 8401 of ESEA that permits the Secretary to grant additional waivers that an SEA may need in light of the ongoing national emergency, there is no demonstrated need to seek additional waiver authority at this time.

**Waiver Authority Recommendation**

None

**Summary of Waiver**

Not Applicable

**Rationale**

Not Applicable

## Individuals with Disabilities Education Act and
## Rehabilitation Act of 1973

**Background**

Recognizing that implementation of the IDEA and the Rehabilitation Act can present difficult challenges during the COVID-19 pandemic, the Department has consistently emphasized (and will continue to do so) that schools and other recipients can and should find solutions for their students. Indeed, the Department is heartened to see many positive examples across the nation of teachers, schools, LEAs, States, as well as Vocational Rehabilitation (VR) agencies, rising to meet the needs of those who rely on them.

The Department is not requesting waiver authority for any of the core tenets of the IDEA or Section 504 of the Rehabilitation Act of 1973, most notably a free appropriate public education (FAPE) in the least restrictive environment (LRE).  The Department's position is based on the principles that:

- Schools can, and must, provide education to _all_ students, including children with disabilities;
- The health and safety of children, students, educators, and service providers must be the first consideration;
- The needs and best interests of the individual student, not any system, should guide decisions and expenditures;
- Parents or recipients of services must be informed of, and involved in, decisions relating to the provision of services; and
- Services typically provided in person may now need to be provided through alternative methods, requiring creative and innovative approaches.

In general, the following recommendations regarding the IDEA and the Rehabilitation Act acknowledge that students, individuals, families, and States are having to adapt to novel circumstances due to the pandemic national emergency.  These recommended flexibilities are rooted in the need to minimize barriers to learning and issues arising from the use of funds in an extraordinary time.  To that end, this report includes recommendations concerning the IDEA (Part C (Infants and Toddlers with Disabilities) to Part B (Assistance for Education of all Children with Disabilities) Transition, and Personnel Development Scholarships), as well as several provisions of the Rehabilitation Act relating to VR programs and funds.

### *IDEA Waiver Authority Recommendations*

### 1. Waiver Authority Recommendation (IDEA Part C to Part B Transition)

Section 612(a)(9) of the IDEA (20 U.S.C. § 1412(a)(9))
Section 614(a)(1)(C)(i)(I) of the IDEA (20 U.S.C. § 1414(a)(1)(C)(i)(I))
Section 637(a)(9)(A)(ii)(II) of the IDEA (20 U.S.C. § 1437(a)(9)(A)(ii)(II))

**Summary of Waiver**

This waiver authority would provide the Secretary with the authority to extend the IDEA Part B transition evaluation timelines (Part B initial evaluation), such that calculation of a timeline obligation shall resume no later than the day on which health and safety factors allow for face-to-face meetings to resume and the toddler is able to be evaluated. This waiver authority would also include explicit authorization for Part C services to continue during the delayed Part B transition evaluation timeline so that a toddler may continue to receive Part C services after his or her third birthday and until a Part B evaluation is completed and an eligibility determination made. This flexibility should allow for CARES Act funds or other Federal education funds (e.g., IDEA Part B funds) to be used to provide these services.

**Rationale**

Without this flexibility, a toddler with a disability will lose access to services once he or she turns 3 years old. With this flexibility, the parent and the SEA or other lead agency may agree to continue providing early intervention services (Part C services) to toddlers with a disability until a Part B evaluation has been completed and an eligibility determination has been made. The funding mechanisms must be addressed, as Part B funds cannot be used for a child not yet eligible for Part B services, and Part C funds cannot be used for a child who has aged out of Part C.

## 2. Waiver Authority Recommendation (Personnel Development Scholarships)

Section 662(h)(1) of the IDEA (20 U.S.C. § 1462(h)(1))

**Summary of Waiver**

This waiver authority would allow the Secretary to grant a deferral of the work or repayment requirements or allow credit to be given for the service obligation if employment was interrupted by the COVID-19 national emergency.

**Rationale**

Section 3519 of Division A of the CARES Act provides relief from the service obligation for those scholars receiving TEACH grants but does not address the IDEA personnel preparation grants. The IDEA personnel preparation grants, similar to TEACH grants, addressed in Division A of the CARES Act, have service obligation requirements that recipients may not be able to meet during the COVID-19 pandemic. However, unlike TEACH grants, the IDEA personnel preparation grants were not included in the CARES Act. If scholars in the program do not, within a specified period, fulfill the employment obligations required by the scholarship, the scholars face repayment penalties for part or all of their scholarships with interest.

***Rehabilitation Act Recommendations Concerning Vocational Rehabilitation (VR) Programs***

Authorized by Title I of the Rehabilitation Act, as amended by Title IV of WIOA (29 U.S.C. § 720 et seq.), VR programs provide support to States in the operation of State VR programs in order to provide services to individuals with disabilities so that those individuals may prepare for and engage in competitive integrated employment. Sections 110(d)(1) and 113(a) of the Rehabilitation Act require States to reserve at least 15 percent of their Federal allotment to provide pre-employment transition services to students with disabilities who are eligible or potentially eligible for VR services. The waiver authority recommendations below seek flexibility for the use of VR funds to support students, youth, and adults with disabilities to prepare for, find, and retain employment.

## 1. Waiver Authority Recommendation (Obligation and Expenditure of FY 2019 Vocational Rehabilitation Carryover Funds)

Section 19 of the Rehabilitation Act (29 U.S.C. § 716)

**Summary of Waiver**

This waiver would provide the Secretary the authority to extend the period of availability for VR program funds allotted in fiscal year (FY) 2019 and available for carryover in FY 2020 for an additional fiscal year. This would provide VR program grantees the ability to obligate and expend VR funds matched in FY 2019 for two succeeding fiscal years.

**Rationale**

These actions would allow the Department to extend the period of performance for FY 2019 VR program funds and permit grantees additional time to expend Federal funds that could not be expended due to the reduction in program services resulting from COVID-19. VR programs used $3.2 billion of Title I and Title VI funds in program year 2018 (including funding from more than one fiscal year) to purchase services from vendors. As a result of COVID-19, these providers have been unable to provide VR services, thereby, limiting the agency's ability to expend Federal VR funds.

This flexibility would make all FY 2019 funds for grantees meeting the carryover requirements available until September 30, 2021. Because section 19 of the Rehabilitation Act governs the period of performance for the VR program and other formula grant programs, GEPA and the "Tydings Amendment" do not apply to these grants.

## 2. Waiver Authority Recommendation (Reservation of Vocational Rehabilitation and Supported Employment Program Funds)

Section 110(d)(1) of the Rehabilitation Act (29 U.S.C. § 730(d)(1))
Section 603(d) of the Rehabilitation Act (29 U.S.C. § 795h(d))
Section 606(b)(7)(I) of the Rehabilitation Act (29 U.S.C. § 795k(b)(7)(I))

**Summary of Waiver**

This recommendation seeks, for FY 2020, authority for the Secretary to waive requirements that States reserve not less than 15 percent of the allocated funds for providing pre-employment transition services to students with disabilities. This recommendation, for FY 2020, further asks that the Secretary be granted authority to waive the requirement that a State reserve and expend half of its allotment for providing supported employment services, including extended services, to youth with the most significant disabilities. The Department recommends that the Secretary be granted authority to waive the accompanying requirement that the State provide a 10 percent non-Federal match on the half of the allotment reserved for these services to youth with the most significant disabilities.

**Rationale**

VR grantees are concerned that, due to the unavailability of students and vendors and a resulting drop in demand for services, they will be unable to expend the funds they are required to reserve. The waiver would not remove the obligation for VR agencies to provide pre-employment transition services or supported employment services. The waiver is necessary as services move to less expensive online methods of delivery and as it becomes increasingly difficult for VR agencies to meet the 15% minimum expenditure required by the statute. Limited access to businesses due to closures will reduce work-based learning opportunities, further reducing expenditures of pre-employment transition funds. For FY 2020, VR agencies are required to reserve and expend $502.7 million in Federal VR funds for the provision of pre-employment transition services. For FY 2020, the amount of $11,161,260 must be reserved for supported employment services. Carrying over the reserved funds will compound the difficulty VR agencies have experienced in meeting the 15% minimum and result in a loss of program funds that could be used to help individuals find or retain employment. For FFY 2018, there were 24 States of 56 State grantees (including territories) that did not meet the 15% pre-employment transition services' requirement. This waiver will prevent States from being penalized for not being able to meet these requirements during the COVID-19 pandemic.

**3. Waiver Authority Recommendation (Allowable Use of Vocational Rehabilitation Funds in Reopening Randolph-Sheppard Facilities)**

Section 103(b)(1) of the Rehabilitation Act (29 U.S.C. § 723(b)(1))

**Summary of Waiver**

This waiver authority would allow the Secretary to permit FY 2020 VR funds to be used to replace expired or spoiled food products at Randolph-Sheppard vending sites required to close due to COVID-19, thus allowing facilities to reopen more efficiently following the COVID-19 pandemic.

**Rationale**

Typically, funds supporting the Randolph-Sheppard Act's Business Enterprise Program participants may be used only to purchase initial stocks and supplies for vending facilities when establishing a new business enterprise; however, due to the unexpected nature of COVID-19 and the rapid manner in which Federal, State, and other facilities closed, vendors may need to purchase new supplies to replace expired or spoiled food products in order to reopen.  Allowing flexibility in the use of VR funds for FY 2020 will allow needed support for vendors to address this difficulty and retain their business enterprise.

### 4. Waiver Authority Recommendation (Internship and Service Obligations for Rehabilitation Services Administration Scholars)

Section 302(b) of the Rehabilitation Act (29 U.S.C. § 772(b))

**Summary of Waiver**

This waiver authority would provide the Secretary to waive the requirement that scholars in the Rehabilitation Long-Term Training (RLTT) program complete an internship in a State VR agency and that the scholars, instead, be given full credit for satisfying this requirement if an internship is interrupted by the COVID-19 pandemic and cannot be completed.

In addition, this recommendation seeks to provide the Secretary with the authority to waive the requirement that scholars in the RLTT program must, within a specified period, maintain employment in a State VR agency or related agency for two years for each year of scholarship assistance they received under the program.  Instead, the Department recommends that scholars receive credit for fulfilling their service obligation for the period during which employment is interrupted by the COVID-19 pandemic.

**Rationale**

If scholars in the RLTT program do not, within a specified period, fulfill the employment obligations required by the scholarship, the scholars face repayment penalties for part or all of their scholarships with interest. Based on the most recent data available, the Department estimates that approximately 4,000 scholars have graduated and need to complete their service obligations. Giving scholars this flexibility protects the health and safety of scholars while acknowledging the unavoidable barriers to employment that have been presented by the COVID-19 pandemic.